1 | KEMNITZER, BARRON & KRIEG, LLP
ADAM J. MCNEILE        Bar No. 280296
2 | KRISTIN KEMNITZER     Bar No. 278946
MALACHI J. HASWELL     Bar No. 307729
3 | 1120 Mar West St., Ste C2
Tiburon, CA 94920
4 | Telephone: (415) 632-1900
Facsimile: (415) 632-1901
5 | adam@kbklegal.com
kristin@kbklegal.com
6 | kai@kbklegal.com

7 | Attorneys for Plaintiffs IRMA BERRIOS, JOSE MURILLO, and MARINA MURILLO

8

9

10 | UNITED STATES DISTRICT COURT

11 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13 | JOSE MURILLO, IRMA BERRIOS, and MARINA MURILLO,

**Case No.**

14 | Plaintiff,

**COMPLAINT FOR:**

15 | vs.

**I.    FRAUDULENT MISREPRESENTATION AND CONCEALMENT;**

16 | GOODLEAP, LLC; and DOES 1 through 20, inclusive,

**II.   VIOLATIONS OF THE CONSUMERS LEGAL REMEDIES ACT (CIVIL CODE §1750, *ET SEQ*.);**

17 | Defendants.

**III.  VIOLATIONS OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. 1681, *ET SEQ*.);**

18

**IV.   VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (CIVIL CODE §1788, *ET SEQ*.);**

19

20

21

**V.    VIOLATIONS OF THE HOME SOLICITATION SALES ACT (CIVIL CODE §1689.5, *ET SEQ*.);**

22

**VI.   VIOLATIONS OF BUSINESS AND PROFESSIONS CODE §7150, *ET SEQ*.;**

23

24

**VII.  VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. §1601, *ET SEQ*.); AND**

25

26

**VIII. VIOLATIONS OF THE UNFAIR COMPETITION LAW (BUSINESS & PROFESSIONS CODE §17200, *ET SEQ*.)**

27

Unlimited Civil Case

28 | _____ /

JURY TRIAL DEMANDED

### INTRODUCTION

1.      This case involves a scheme in which Defendant GOODLEAP LLC ("GOODLEAP") partners with unscrupulous door-to-door salespersons and contractors to target vulnerable consumers for the fraudulent sale and onerous "financing" of solar panels. Plaintiffs are a father (Jose), mother (Irma), and adult daughter (Marina) who live in a main house[1] and additional dwelling unit in Reseda. Jose and Irma are monolingual Spanish speakers who cannot read or write in English.

2.      GOODLEAP and its agents preyed on Plaintiffs, fraudulently affixing their electronic signatures on two loans for solar panels that none of them agreed to, pulling their credit for an unauthorized purpose, and attempting to collect on the fraudulent loans – even threatening them with legal action if they did not pay. On top of the fraudulent loans made in their names, GOODLEAP's partner solar panel installer Pacific Energy Network ("PEN") put solar panels on Plaintiffs' home that never functioned, damaging their home in the process.

3.      These loans are not mere trifles. One is for $49,968 and the other is for $19,553. One may ask what is in it for GOODLEAP to make fraudulent loans? The answer is simple – it takes an undisclosed "kickback" on every loan it funds and then securitizes and sells the loans on to various financial institutions. GOODLEAP then continues to "service" the loans, also taking a fee for this as well.[2] GOODLEAP therefore insulates itself from the risk of these bad loans – spreading the risk from the fraudulent loans out among multiple other downstream purchasers of the securitized loans.

4.      To keep the flow of loans (and profits), GOODLEAP authorizes door-to-door salespeople like those of PEN to sign consumers like Plaintiffs up for multi-decade loans that provide almost no value to the consumer. GOODLEAP systematically and purposefully fails to exercise oversight over its salespersons, giving these persons near carte blanche authority to enter consumers into loans with GOODLEAP that the consumers never agreed to in the first place.

---

[1] Jose and Irma live in the "Main House" at 7459 Baird Avenue. Marina lives in the "ADU" at 7461 Baird Avenue.
[2] *See* https://www.managementstudyguide.com/goodleap-business-model.htm (last visited November 2, 2023).

Plaintiffs, through no fault of their own, fell victim to this trap.

5.     No Plaintiff signed *any* agreement with GOODLEAP, let alone an enforceable agreement. On September 1, 2022, a door-to-door salesperson who said his name was "Felipe" who GOODLEAP vested with authority to enter consumers into loans showed up at Plaintiff's door and, over a matter of hours, gained Irma's trust. Irma provided him with her and her family's personal information, including an email address and password, social security numbers, and blank checks. Felipe had told her he needed all this information to provide Irma with a "proposal."

6.     Felipe never provided Irma with a proposal. Instead, he passed this information to GOODLEAP, used it to pull Plaintiffs' credit without authorization, and entered Plaintiffs into loans for solar panels they never agreed to. In fact, Jose and Marina never even spoke to Felipe or anyone with GOODLEAP – Marina was out of the house at the time, and Jose was recovering from a medical procedure.

7.     The very next morning, installers showed up to put solar panels on the roof. Plaintiffs were confused because they never signed anything; Felipe hadn't even provided a proposal. The workers put panels on and left. Months later, Plaintiffs were even more surprised when GOODLEAP began billing Plaintiffs for the non-functioning solar panels to which they never agreed.

8.     To this day, despite Plaintiffs lawfully cancelling any and all alleged contracts (which, regardless, were void *ab initio*), GOODLEAP continues to demand monthly payments from Plaintiffs on the fraudulent contracts.

9.     Plaintiffs bring this action for Fraudulent Misrepresentation and Concealment and violations of the Consumers Legal Remedies Act, Civ. Code §1750, *et seq.* (the "CLRA"); the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* (the "FCRA"); the Rosenthal Fair Debt Collection Practices Act, Civ. Code §1788, *et seq.* (the "Rosenthal Act"); the Home Solicitation Sales Act, Civ. Code §1689.5, *et seq.* (the "HSSA"); Bus & Prof. Code §7150 *et seq.*; the Truth in Lending Act, 15 U.S.C. §1601, *et seq.* ("TILA"); the Unfair Competition Law, Bus & Prof.

Code §17200, *et seq.* (the "UCL") and to obtain actual, statutory, civil, treble, and punitive damages for the harm that they have suffered. Plaintiffs also seek a public injunction against GOODLEAP, to enjoin its unlawful, unfair, and fraudulent conduct.

## PARTIES

10.     Plaintiffs are individuals over the age of 18 years. At all times relevant herein, Plaintiffs were, and currently are, residents of the State of California, County of Los Angeles.

11.     Defendant GOODLEAP is, and at all times relevant herein was, a California corporation with its principal place of business in California, that at all times relevant herein was licensed to do business and was conducting business in California.

12.     At all times relevant hereto, GOODLEAP extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable, making GOODLEAP a creditor within the meaning of TILA, 15 U.S.C. §1602(g).

## DOE DEFENDANTS

13.     Plaintiffs do not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, pursuant to §474 of the California Code of Civil Procedure. Nonetheless, Plaintiffs allege that Defendants DOES 1 through 20, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein and are legally liable to Plaintiff. Plaintiffs will seek leave to amend this complaint to set forth the true names and capacities of the DOE Defendants, together with appropriate charging allegations, if and when ascertained.

## THE HOLDER RULE

14.     All claims and defenses that Plaintiffs have against PEN arising out of the solar panel transaction are also valid against GOODLEAP, because GOODLEAP is the holder of any alleged consumer credit contract. Given the violations of law alleged below, and the Federal Trade Commission Holder in Due Course rule, 16 C.F.R. §433, *et seq.*, which subjects the holder

of a consumer credit contract to all claims and defenses of the consumer against the seller, GOODLEAP is subject to all claims and defenses Plaintiffs may have against PEN.

### AGENCY

15.     Plaintiffs are informed, believe and thereon allege that at all times mentioned herein, each Defendant, whether actually or fictitiously named, was the principal, agent (actual or ostensible), or employee of each other Defendant. In acting as such principal or within the course and scope of such employment or agency, each Defendant took some part in the acts and omissions hereinafter set forth, by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

16.     Furthermore, Plaintiffs are informed, believes and thereon alleges that at all times mentioned herein PEN employees and/or representatives act as agents and at the direction of GOODLEAP as part of the GOODLEAP Program described below. GOODLEAP retained the right to control the conduct of PEN, including by (1) requiring PEN sales agents to use specific software, applications, and technology when engaging in transactions with consumers on GOODLEAP's behalf; (2) controlling the GOODLEAP products PEN sales agents could offer, the terms and conditions of the products offered, the method of presentation of the products offered, and the contractual documents that could be utilized; (3) controlling the marketing and sales tactics of the PEN and its sales agents; (4) retaining the right to discipline PEN and sales agents for violations of policies and procedures set by GOODLEAP. At all times, GOODLEAP has ratified the conduct of PEN and its sales agents, including in the instant case.

### JURISDICTION AND VENUE

17.     This Court has federal subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §1331. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367(a).

18.     Venue is proper in the Central District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. § 1391(b)(2).

### FACTUAL ALLEGATIONS

**The Consumer Solar Panel Industry**

19.     The solar industry is one of the fastest growing global industries, with a global valuation

of $154.47 billion in 2020, and estimated to balloon to over $1 trillion by 2028.[3] Though green

energy in theory is a noble goal, the exponential growth in the industry has led to an exponential

growth of fraud, with little to no oversight.

20.     GOODLEAP oversees and then ratifies the fraud perpetrated by its agents such as PEN

and PEN's salespersons. As GOODLEAP is well aware, the solar panel installation business is

heavily populated with deceptive and dishonest contractors targeting, preying upon, and ripping

off vulnerable consumers.[4]

---

[3] *See Solar Photovoltaic Market Size [2021-2028] USD 1,00.92 Billion*, Apr. 25, 2022, https://finance.yahoo.com/news/solar-photovoltaic-market-size-2021-120400068.html (last visited on October 19, 2022).

[4] *See, e.g.*, *U.S. v. Vivint Smart Home, Inc.*, Case No. 2:21-cv-00267-TS (D. UT 2021) (stipulated order for permanent injunction and civil penalty judgment for Vivint's violation of the FTC's "Red Flags Rule" involving identity theft); *New Mexico v. Vivint Solar, Inc.*, Case No. D-202-CV-201801936 (lawsuit by New Mexico Attorney General alleging solar panel installation contractor engaged in unfair and deceptive practices including fraudulently inducing consumers to enter into twenty-year power purchase agreements which would purportedly save them significant amounts of money); *State of Minnesota, by its Attorney General Keith Ellison v. Brio Energy LLC et al.*, Hennepin County, Case No. 27-CV-22-6187 (lawsuit by Minnesota Attorney General against four Utah-based solar panel companies alleging they lied about their relationship with Minnesota utilities, misrepresented financial benefits of purchasing solar panels, and tricked consumers into signing binding sales contracts and loan agreements); Alana Samuels, *Rooftop Solar Power Has a Dark Side*, TIME, September 26, 2023, available at https://time.com/6317339/rooftop-solar-power-failure/ (last visited October 2, 2023); Bailey Schulz, *New Jersey Solar Company Allegedly Pressured Vulnerable Populations Into Contracts for a 'Shoddy Product'*, USA TODAY, April 12, 2023, available at https://www.usatoday.com/story/money/2023/04/10/vision-solar-panel-lawsuit/11600307002/ (last visited on September 22, 2023) (detailing class action suit filed in New Jersey on behalf of plaintiffs from five States alleging that solar panel leasing company Vision Solar salespeople used high-pressure sales tactics to convince homeowners - including low-income, disabled and elderly individuals - to purchase or lease solar panel systems); Press Release, Office of the Attorney General of the State of Kentucky, *Attorney General Cameron Leads Nine States in Urging Five Solar Lender Companies to Suspend Financial Obligations For Pink Energy Consumers*, November 22, 2022, available at https://www.kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=1287 (last visited October 1, 2023); Press Release, Office of the Attorney General State of Idaho, *Attorney General Issues Tips for Homeowners on Solar Installations*, February 21, 2022, available at https://www.ag.idaho.gov/newsroom/attorney-general-issues-tips-for-homeowners-on-solar-installations/ (last visited September 22, 2023) (reporting the Idaho AG issued a consumer alert regarding solar companies' use of misleading sales tactics through door-to-door sales and social media advertisements); Lauren Trager, *Missouri Attorney General Sues Solar Panel Company After Customer Complaints, News 4 Investigation*, KMOV, September 30, 2022, available at https://www.kmov.com/2022/10/01/missouri-attorney-general-sues-solar-power-company-after-customer-complaints-news-4-investigation/ (last visited September 22, 2023) (reporting that

GOODLEAP'S Scheme

## **GOODLEAP's Partner Program**

21.     The deceptive sales tactics of solar panel installation contractors are enabled, facilitated, and ratified by the large financing companies like GOODLEAP that fund the projects. The industry is rife with scams due to the deputization of door-to-door salespersons tasked with signing vulnerable consumers up for tremendously expensive, multi-decade contracts and loans.[5]

former Missouri Attorney General and now US Senator Eric Schmitt sues Pink Energy for making false promises and misrepresentations to consumers, deception, and concealing material facts); Press Release, Office of the Attorney General of Connecticut, *Attorney General Tong Sues Vision Solar Over Unfair and Deceptive Sales, Violations of Home Improvement Act* (March 16, 2023), available at https://portal.ct.gov/AG/Press-Releases/2023-Press-Releases/Attorney-General-Tong-Sues-Vision-Solar-Over-Unfair-and-Deceptive-Sales (last visited September 22, 2023) (disclosing that the Attorney General of Connecticut sued Vision Solar for preying on low-income, elderly, and disabled homeowners, pressuring them into unaffordable loans for solar panels that in some cases were never activated); David Lazarus, *Column: This Solar Company Wouldn't Let a Dead Woman out of Her Contract*, LA TIMES, June 1, 2021, available at https://www.latimes.com/business/story/2021-06-01/column-solar-power-dead-customer (reporting that Vivint (subsequently Sunrun) signed up a 91-year-old woman for solar panels weeks before her death and then steadfastly refused the family's pleas to cancel the contract after her death).

[5] *See, Vivint Solar Buyers Ink Deal in Predatory Sales Suit*, LAW360, Sept. 12, 2022, https://www.law360.com/articles/1529150/vivint-solar-buyers-ink-deal-in-predatory-sales-suit (last visited on October 19, 2022); Press Release, Better Business Bureau, *BBB Scam Alert: "Free solar panels" can cost you big time! How to spot a phony offer and find a trustworthy business* (September 22, 2023), available at https://www.bbb.org/article/scams/27595-bbb-scam-alert-free-solar-panels-can-cost-you-big-time-how-to-spot-a-phony-offer (last visited on September 28, 2023); Better Business Bureau Business Profile of Sunnova Energy Corporation, Current Alert of deceptive sales practices, available at https://www.bbb.org/us/tx/houston/profile/solar-energy-design/sunnova-energy-corporation-0915-90035524 (last visited September 28, 2023); Press Release, California Contractors State Licensing Board, *CSLB Warns Consumers to be Cautious of Misleading and Illegal Solar Advertisements* (April 17, 2023), available at https://www.cslb.ca.gov/Resources/PressReleases/2023/Illegal_Advertisements.pdf (last visited September 28, 2023); Better Business Bureau Business Profile of Solar Mosaic LLC, Current Alert of forced payments for solar services not received, available at https://www.bbb.org/us/ca/oakland/profile/financial-services/solar-mosaic-llc-1116-444414/complaints (last visited September 28, 2023); Randy Travis, *Georgia PSC 'getting lit up with complaints about home solar ripoffs*, FOX5 ATLANTA, May 26, 2022, available at https://www.fox5atlanta.com/news/psc-getting-lit-up-with-complaints-about-home-solar-ripoffs (last visited September 28, 2023); Dale Yurong, *198 Fresno County residents cheated in solar power scam*, ABC30 FRESNO, September 19, 2019, available at https://abc30.com/fresno-county-fersno-scam-solar-fraud/5554203/ (last visited September 28, 2023); *Vivint Solar Investors Sue Brass Over Predatory Sales Worries*, LAW360, Mar. 10, 2020, https://www.law360.com/articles/1252108/vivint-solar-investors-sue-brass-over-predatory-sales-worries (last visited on October 19, 2022); Kurtis Ming, *California Establishes Fund for Victims of Solar Fraud*, CBS SACRAMENTO, Jul. 25, 2022, available at https://www.cbsnews.com/sacramento/news/california-establishes-fund-for-victims-of-solar-fraud/ (last visited on October 19, 2022); *CFPB Takes Action Against Fintech Company*

22.      GOODLEAP claims it is the largest lender and/or loan broker in the consumer solar

marketplace. As of January 27, 2021, GOODLEAP controlled 41% of the solar panel lending

market.[6] GOODLEAP's business model relies on the deceptive practices of its Partners in order

to gain an advantage over its competitors. As of August 31, 2023, GOODLEAP had funded over

$24 billion of solar and home improvement loans to 700,000 customers.[7]

23.      GOODLEAP administers a paperless lending platform that it says is "frictionless" and

allows near-instant approval of multi-decade loans of tens of thousands of dollars. The focus of

GOODLEAP's business is arranging loans to finance the purchase and installation of solar

panels on the homes of individual consumers.

24.      To expand its business, GOODLEAP designed, implemented and oversees the

"GOODLEAP Program." GOODLEAP entices solar installation contractors to join the

GOODLEAP Program by promising that by doing so they will increase sales by up to 30%.

Under the GOODLEAP Program the contractors become GOODLEAP's "Partners" and the sales

agents of these "Partners" are deputized to simultaneously sell customers solar panels and

arrange financing for the purchase of the solar panels through GOODLEAP loans. The

availability of financing allows the "Partner" contractors to close more transactions.

25.      GOODLEAP vests the sales agents of its "Partners" with the authority to obtain

---

*GreenSky for Enabling Merchants to Secure Loans For Consumers Without Their Authorization*,
CONSUMER FINANCIAL PROTECTION BUREAU, Jul. 12, 2021,
https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-fintech-
company-greensky-for-enabling-merchants-to-secure-loans-for-consumers-without-their-
authorization/#:~:text=The%20CFPB%20issued%20a%20consent,to%20prevent%20future%20f
raudulent%20loans (last visited October 19, 2022); Jeff Goldman, NJ.COM, Oct. 24, 2019, *Vivint
Solar Agrees to Pay $122k Fine Over Charges of Deceptive Door-to-Door Sales Practices*,
https://www.nj.com/news/2019/10/vivint-solar-agrees-to-pay-122k-fine-over-charges-of-
deceptive-door-to-door-sales-practices.html (last visited October 19, 2022); *Vivint, Inc. to pay
$375,000 to Resolve Allegations of Deceptive Advertising and Sales Practices*, Feb. 12, 2015,
GEORGIA OFFICE OF THE ATTORNEY GENERAL CONSUMER PROTECTION DIVISION,
https://consumer.georgia.gov/press-releases/2015-02-12/vivint-inc-pay-375000-resolve-
allegations-deceptive-advertising-and-sales (last visited on October 19, 2022).
[6] Ari Levi, CNBC, *Exec Who Quit Solar City Now Runs the Leading Lender for Solar
Installations,* Jan. 27 2021 https://www.cnbc.com/2021/01/27/hayes-barnard-turns-loanpal-into-
billion-dollar-lender-after-solarcity.html (last visited on January 17, 2023).
[7] Cision PR Newswire, *GoodLeap Announces Closing of $470 Million Securitization Bringing
the Company's Total to 18*, August 31, 2023, https://www.prnewswire.com/news-
releases/goodleap-announces-closing-of-470-million-securitization-bringing-the-companys-total-
to-18-301915376.html (last visited November 2, 2023).

nonpublic Personally Identifiable Information ("PII") from consumers, to submit loan applications on their behalf, and to obtain the consumers' credit reports. The "Partners" and their sales agents are GOODLEAP's agents in originating loans. Although GOODLEAP uses its "Partners'" sales agents to generate loans, it does not bother to verify that the salespeople have completed the requisite registration to lawfully sell solar panels to consumers door-to-door, as in this case.

26.     GOODLEAP offers its "Partners" immediate, on-the-spot approval of the loan applications that they submit through an electronic, paperless process. This assures the "Partner" contractors that they can close transactions in minutes with the assurance that they will be promptly paid for every deal they close.

27.     GOODLEAP retains a portion of every loan generated by the sales agents of its "Partners" to cover its fees and charges. Thus, both GOODLEAP and the "Partner" contractors financially benefit from every loan generated by the sales agents of the "Partners" in the GOODLEAP Program. GOODLEAP is incentivized to keep "Partners" happy as they are GOODLEAP's agents and joint venturers in the GOODLEAP Program and the source of GOODLEAP's fees.

28.     The GOODLEAP Program enables and facilitates the exploitation of vulnerable consumers by unscrupulous solar installation contractors who become "Partners" in the GOODLEAP Program. There are no effective safeguards in the GOODLEAP Program to protect consumers. As a result, consumers are placed in loans that they did not authorize, whose terms they had no opportunity to review, and that they do not understand.

29.     GOODLEAP's business model allows its "Partners" to reap massive profits from saddling consumers with tens of thousands of dollars in debt to which they never agreed. The GOODLEAP Program's paperless system, focus on speed, and financial incentives allow "Partners" to close sales transactions, lock customers into financing, receive immediate payment through the GOODLEAP Program, and be long gone by the time a consumer receives their first invoice from GOODLEAP.

30.     GOODLEAP has elected to turn a blind eye to misconduct by its "Partners" and, despite deputizing them with significant authority to lock consumers into loans, exercises virtually no oversight over their activities. Instead, GOODLEAP chooses to rely upon meaningless warranties and representations in contracts with its "Partners" and to pocket a portion of every loan generated by its "Partners."

31.     Lenders such as GOODLEAP have statutory duties not to engage in unfair acts and practices regarding loans to customers who did not authorize them under 12 U.S.C. §§5531(a) and 5536(a)(1)(B). A lender, such as GOODLEAP, also has a statutory duty under these same provisions not to engage in unfair acts and practices by structuring its loan origination and servicing activities in a manner that enables unauthorized loans. In designing, implementing, and overseeing the GOODLEAP Program in way that allows unauthorized loans, GOODLEAP has violated its statutory duties.

32.     SOLGEN participates in the GOODLEAP Program and is one of GOODLEAP's "Partners." It utilizes a fraudulent scheme to saddle consumers with solar panel installation contracts and unauthorized loans to finance the purchase of the solar panels.

### GOODLEAP Violates Federal Law Regulating Credit Reporting

33.     The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681 *et seq.*, was enacted to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Dutta v. State Farm Mut. Auto. Ins. Co.* (9th Cir. 2018) 895 F.3d 1166, 1169 (quoting *Safeco Ins. Co. of Am. v. Burr* (2007) 551 U.S. 47, 52).

34.     GOODLEAP violates the FCRA and its implementing regulations because it has not developed a statutorily compliant Identity Theft Prevention Program as required by 16 C.F.R. §681.1(d) ("Red Flags Rule"). *See also* 15 U.S.C. §1681m(e). GOODLEAP further violates the FCRA by obtaining consumer reports for reasons other than the statutorily permissible purposes. 15 U.S.C. 1681b(f).

### Red Flags Rule Violations

35.     Rules promulgated under the FCRA require that "[e]ach financial institution or *creditor*

that offers or maintains one or more *covered accounts* must develop and implement a written Identity Theft Prevention Program (Program) that is designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account." 16 C.F.R. §681.1(d)(1) (emphasis added) (the "Red Flags Rule").

36.     The Red Flags Rule adopts the definition of a "creditor" under the Equal Credit Opportunity Act as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. §1691a(e); 16 C.F.R. §681.1(b)(5). Further, the Red Flag Rule supplements that definition and requires that a creditor fulfill at least one of the three conditions in 15 U.S.C. §1681m(e)(4)(A). 16 C.F.R. §681.1(b)(5). Relevant here, a "creditor" for the purposes of the Red Flag Rule is one that "obtains or uses consumer reports, directly or indirectly, in connection with a credit transaction." 15 U.S.C. §1681m(e)(4)(A)(i).

37.     GOODLEAP is a "creditor" required to comply with the Red Flags Rule because it "regularly extends, renews, or continues credit" to finance the purchase and installation of solar panels on the homes of individual consumers, *see* 15 U.S.C. §1691a(e), and it "obtains or uses consumer reports, directly or indirectly, in connection with [] credit transaction[s]"—namely, credit transactions for the sale of solar panels. 15 U.S.C. §1681m(e)(4)(A)(i).

38.     The Red Flag Rule defines a "covered account" as: "[a]n account that a financial institution or creditor offers or maintains, primarily for personal, family, or household purposes, that involves or is designed to permit multiple payments or transactions, such as a credit card account, mortgage loan, automobile loan, margin account, cell phone account, utility account, checking account, or savings account." 16 C.F.R. §681.1(b)(3)(i).

39.     The loan accounts GOODLEAP offers and maintains in connection with transactions for the sale of solar panels are "covered accounts" within the meaning of the Red Flag Rule because they are accounts that are used primarily for personal, family, or household purposes (i.e., non-commercial) and are designed to permit multiple payments.

40.     Identity theft is defined as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. §1022.3(h).

41.     A Program required by the Red Flags Rule "must be appropriate to the size and complexity of the financial institution or creditor and the nature and scope of its activities," 16 C.F.R. §681.1(d)(1), and must contain "reasonable policies and procedures to":

> (i) Identify relevant Red Flags for the covered accounts that the financial institution or creditor offers or maintains, and incorporate those Red Flags into its Program;
>
> (ii) Detect Red Flags that have been incorporated into the Program of the financial institution or creditor;
>
> (iii) Respond appropriately to any Red Flags that are detected pursuant to paragraph (d)(2)(ii) of this section to prevent and mitigate identity theft; and
>
> (iv) Ensure the Program (including the Red Flags determined to be relevant) is updated periodically, to reflect changes in risks to customers and to the safety and soundness of the financial institution or creditor from identity theft.

42.     16 C.F.R. §681.1(d)(2). A "Red Flag" means "a pattern, practice, or specific activity that indicates the possible existence of identity theft." 16 C.F.R. §681.1(b)(9).

43.     The Program must be approved by a board of directors or an appropriate committee of the board of directors; involve senior level management in the oversight, development, implementation, and administration of the Program; train staff to effectively implement the Program; and exercise appropriate and effective oversight of service provider arrangements. 16 C.F.R. § 681.1(e). Financial institutions or creditors that are required to develop a Program must consider the guidelines set forth in 16 C.F.R. §681, App. A, and include in their Programs the guidelines that are appropriate. 16 C.F.R. §681(f).

44.     GOODLEAP violates the Red Flag Rule because, on information and belief, it does not have an Identity Theft Protection Program that is appropriate to its size and complexity and designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account. *See* 16 C.F.R. §681.1(d)(1). It has no

reasonable policies or procedures to identify relevant Red Flags and incorporate those Red Flags into a Program, to detect Red Flags, to respond appropriately to any detected Red Flags, or to periodically update its Program. *See* 16 C.F.R. §681.1(d)(2). It does not train staff on recognizing or responding to Red Flags. *See* 16 C.F.R. §681.1(e)(3). It has no policies and procedures for exercising appropriate and effective oversight of its service providers, including the solar panel installers who travel door-to-door to sign up customers for GOODLEAP financing. *See* 16 C.F.R. §681.1(e)(4).

45.     Further, GOODLEAP has not implemented the guidelines listed in 16 C.F.R. §681, App. A (the "Guidelines"). For example, the Guidelines list appropriate responses to the detection of identity theft, including closing an existing covered account and not attempting to collect on a covered account or not selling a covered account to a debt collector. 16 C.F.R. §681, App. A IV(f), (g). Despite having actual notice that Plaintiffs were the victim of identity theft, as they did not authorize the use of their personal information to be listed on the loan GOODLEAP extended to him, GOODLEAP took no or insufficient steps to investigate Plaintiff's claim or open a fraud investigation. Instead, GOODLEAP falsely reported a past-due balance on a GOODLEAP account to consumer reporting agencies, damaging Plaintiff's credit. GOODLEAP still alleges that Plaintiffs are obligated is on a loan to which they never consented.

46.     The Guidelines also provide guidance for the oversight of service providers who perform activities in connection with covered accounts and recommend that "the financial institution or creditor should take steps to ensure that the activity of the service provider is conducted in accordance with reasonable policies and procedures designed to detect, prevent, and mitigate the risk of identity theft." 16 C.F.R. §681, App. A VI(c). This could include requiring the service providers to have policies and procedures to detect relevant Red Flags and either report such Red Flags to the creditor or take appropriate steps to prevent or mitigate the occurrence of identity theft. 16 C.F.R. §681, App. A VI(c). GOODLEAP does not exercise the requisite oversight over its solar installer Partners, who have near carte-blanche authority to enter customers into financing for the purchase of solar panels through GOODLEAP loans. GOODLEAP essentially

rubberstamps the loan applications submitted by its Partners by offering immediate, on-the-spot approval, and does not perform sufficient investigation to ensure consumers – such as Plaintiffs – have consented to credit pulls or loans generated with the PII submitted by GOODLEAP's Partners.

47.    GOODLEAP's failure to implement a compliant Identity Theft Protection Program enables systematic and widespread violations of the FCRA, damaging consumers who do not have notice that they are obligated on expensive, multi-decade loans to which they never consented. Consumers also have no reasonable recourse once they learn their information has been used without their consent, since GOODLEAP does not maintain sufficient policies or procedures to investigate and mitigate the occurrence of identity theft.

## Permissible Use Violations

48.    The FCRA prohibits persons from obtaining consumer reports for any reason other than a permissible purpose. 15 U.S.C. §1681b(f) ("A person shall not use or obtain a consumer report for any purpose unless . . . the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section."). Additionally, the entity using the credit report must certify truthfully that it is obtaining the consumer report for a permissible purpose. 15 U.S.C. §1681b(f)(2).

49.    GOODLEAP violates the permissible use prohibitions in the FCRA by obtaining and using consumer reports when GOODLEAP's sales representatives seek and obtain the consumer reports underlying GOODLEAP's extension of financing for the purchase of solar panels and do not consent to be borrowers on GOODLEAP loan agreements. Circumventing credit score limitations by pulling the credit report of a consumer, and then signing that person up as a borrower on expensive, multi-decade loans without their knowledge or consent, is not a permissible purpose under the FCRA.

## GOODLEAP and its Salespeople Entrapped Plaintiffs in Fraudulent Contracts

50.    Plaintiffs are a close-knit family who live in two different houses on the same piece of property in Reseda. Jose is 58 years old, Irma is 57, and Marina is 33. Jose and Irma are married

and live with their daughter in the Main House; Marina lives with her family in the ADU. Jose has been in poor health since 2020, when he was laid off from his construction job, where he had worked for twenty years. Irma was forced to retire from her job in housekeeping at a hospital to take care of Jose. Marina has been in school to become a nurse and has recently started a job at UCLA Health in Santa Clarita.

51.    Jose and Irma are monolingual Spanish speakers. They cannot read or write in English and have only limited understanding of spoken English. Jose and Irma both have very limited technological proficiency. While Irma has the ability to access her email on her phone, she does not know how to review and sign documents electronically. Jose does not have an email address. He also does not know how to sign documents electronically.[8]

52.    Plaintiffs had never had any interest in solar panels and had never reached out to any company to inquire about solar panels. On September 1, 2022, a door-to-door salesperson who said his name was "Felipe" showed up at the door of the Main House at about 9 a.m. Only Irma and Jesus were home. Jesus was resting and recovering from his three-times-per-week dialysis, which he had the previous day. Irma answered the door, and she was the only one to talk to Felipe the entire time he was there. Felipe spoke Spanish with Irma. He told Irma his company was partners with LAWP and that his company was offering solar panels. He said that Irma would only have to pay $66/month for solar panels and that the bill for solar panels would replace the LAWP bill. Irma was interested, so she asked for a proposal.

53.    Felipe said that he would get Irma a proposal but needed information to see if Irma and her family qualified for solar panels. Felipe gathered the following information:

- Who owned the houses
- Who lived in the houses
- Social security numbers for Irma, Jose, and Marina
- LAWP bill

---

[8] While Marina has technological capabilities, she was not home during the time of the alleged transaction between Plaintiffs and GOODLEAP and did not otherwise authorize any sort of transaction between herself, her parents, and GOODLEAP.

- Irma's email address

54.     While he was there, Felipe said that he needed Irma to review the "proposal." Felipe said that it would be easier to review the documents if he could log in to Irma's email address on his tablet device. Irma provided Felipe her email address and password. Felipe also asked to use Irma's phone. Irma let him. Irma heard Felipe talking to someone in English on her phone but could not understand what he was saying.

55.     Felipe never showed Irma any proposal and did not explain to her any documents that may have contained a proposal. Felipe never provided Irma (or any Plaintiff) with any paper documents. He never showed Irma any documents on his tablet. He left Irma at about noon.

56.     Felipe returned later that day and asked Irma for blank checks so that he could continue his determination as to whether the family would qualify for solar panels. Irma provided Felipe with two blank checks – one for Irma and Jesus and the other for Marina. Felipe promised to return the checks but never did. At no point that day did anyone other than Irma speak with Felipe, and Felipe did not return to the house again.

57.     The next morning, on September 2, 2022, Plaintiffs were perplexed when workers showed up at Plaintiffs' home and began installing solar panels. Immediately, Irma tried to contact Felipe to inquire why there were installers at the house because she had never agreed to anything – Felipe hadn't even provided her a proposal.

58.     Felipe provided numbers to call, but Irma could not reach anyone at any of the numbers. Plaintiffs did not know what to do. During the "installation", the workers damaged a bedroom wall in the ADU. While solar panels were placed on the roof of both the Main House and the ADU, they were not turned on and have never functioned. The workers left after a few hours and never returned.

59.     Plaintiffs did not understand what had happened but then were horrified when they began receiving bills from GOODLEAP months later. Plaintiffs had never heard of GOODLEAP before receiving the bills. Marina also realized that monthly payments were being taken directly out of Marina's bank account. Marina had never authorized these payments.

60.     Marina called GOODLEAP to question why monthly payments were being taken out. GOODLEAP said Plaintiffs had signed up for a loan for solar panels. Marina explained that nobody in her family had agreed to any loan (or to purchase solar panels) or signed anything. Marina then called her bank to stop the payments. When the payments stopped, GOODLEAP began harassing Plaintiffs for payments. Plaintiffs were terrified that GOODLEAP would take their homes, so they resumed payments.

61.     During the Winter of 2022, it rained a lot in Plaintiffs' area, and Plaintiffs realized that the roof over the back patio was leaking. Plaintiffs attempted to contact PEN, but nobody would help. When Plaintiffs called GOODLEAP about this, GOODLEAP told Plaintiffs that they had to work with PEN and that there was nothing GOODLEAP could do.

62.     Plaintiffs became increasingly exasperated, as PEN had gone out of business, and GOODLEAP would not do anything. Plaintiffs kept making payments for solar panels that did not work, which Plaintiffs had never agreed to in the first place, scared that if they did not make payments, GOODLEAP would attempt to take their home.

63.     In May 2023, Plaintiffs again contacted GOODLEAP, this time requesting the contracts GOODLEAP claimed Plaintiffs were obligated on. GOODLEAP emailed Marina the contracts. For the first time, Plaintiffs saw these documents. Plaintiffs saw that there were forged signatures on all the alleged loan agreements and that Irma's name was even misspelled. They were horrified to see the amounts and that there were two separate purported loans – (1) one was purportedly for the Main House for a $19,553 loan obligation with a finance charge of $8,492.11, and Total of Payments of $28,045.11 that GOODLEAP claims Jose and Irma are obligated on and (2) the other was for the ADU for a $49,968 loan obligation with its finance charge of $21,707.73, and Total Payments of $71,669.73 that GOODLEAP claims Jose and Marina are obligated on. Plaintiffs never signed either purported loan agreement – and told this to GOODLEAP. Further, all purported agreements were in English, but Irma and Jose and monolingual Spanish speakers, Irma did not speak with the representative in any language other than Spanish, and Jose did not speak with the representative at all.

64.    GOODLEAP refused to do anything about the fraudulent loans. Then, in mid-August, a room in the Main House began leaking. While the solar panels were put on Plaintiffs' roof in September 2022, they have never functioned. Nor are the panels fully permitted.

65.    GOODLEAP and its authorized agents exploited Plaintiff's vulnerabilities. Its partner salesperson did not provide Plaintiffs with a paper or electronic contract or agreement. In fact, the salesperson never offered Plaintiffs any kind of information or documentation of any type. No Plaintiff ever touched any electronic devices the salesmen had in their possession or otherwise agreed to any contract with GOODLEAP or PEN. The salesperson merely assured Irma that they would return shortly to see if Irma qualified for the program.

66.    Plaintiffs never consented to the use of electronic records to receive all disclosures they are entitled to receive under the law, much less in a manner reasonably demonstrating that they could access the disclosures in an electronic form. Further, Plaintiffs each did not and could not have intended to sign any agreement with GOODLEAP electronically, since they never knew about the GOODLEAP contract.

67.    Although Plaintiffs have previously canceled any alleged contracts, and such contracts are forged, rendering them void *ab initio*, this complaint shall constitute separate notice of the forgeries and the request for cancellation pursuant to the Home Solicitation Sales Act, Civil Code §§1689.7 and 1689(b)(1).

68.    Despite Plaintiff's lawful cancellation of any alleged contract(s) and/or loan agreement(s) and notice of fraudulent activity, which were void *ab initio*, GOODLEAP refuses to acknowledge the lawful rescission and have declined to take any corrective action.

69.    GOODLEAP continues to claim that Plaintiffs are bound by contracts they never signed, thereby ratifying all actions taken by PEN and any sales agents.

70.    The contracts that GOODLEAP claims Plaintiffs are obligated on are attached hereto as **Exhibits A** and **B**.

71.    This ordeal has caused Plaintiffs' family tremendous stress. Irma had preexisting stomach problems which have become significantly worse due to the stress of this situation. Jesus is

experiencing high blood pressure. Further, each Plaintiff has experienced loss of sleep and anxiety. GOODLEAP's actions have had a severe negative effect on each Plaintiff and have caused them to suffer non-economic damages including emotional distress, stress, anxiety, and loss of enjoyment of life.

**FIRST CAUSE OF ACTION**
**(Fraudulent Misrepresentation and Concealment)**
**(On behalf of PLAINTIFFS against GOODLEAP and DOES 1-20)**

72. Plaintiffs reallege and incorporates by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

73. GOODLEAP made false representations to Plaintiffs including, but not limited to representing that Plaintiffs had signed and were obligated on purported loan agreements that they never signed.

74. These representations were false when made. GOODLEAP knew the representations were false or recklessly disregarded the truth. GOODLEAP intended for Plaintiffs to rely on the truth of these representations and they reasonably did so.

75. GOODLEAP had a legal obligation to disclose any purported loan documents and related documents to Plaintiff, which included many material terms and conditions but intentionally concealed and did not disclose the above documents to Plaintiffs at any point before the installation of solar panels on Plaintiffs' home.

76. The representations and intentional concealment by GOODLEAP were material and was willful, malicious, wanton, intentional, and reckless.

77. Plaintiffs have been harmed by the representations and the representations were a substantial factor in causing harm to Plaintiffs.

WHEREFORE, Plaintiffs prays for relief as set forth below.

**SECOND CAUSE OF ACTION**
**(Violations of the Consumers Legal Remedies Act, Civil Code §1750, *et seq*.)**
**(On Behalf of Plaintiffs and the General Public Against GOODLEAP and DOES 1-20)**

78. Plaintiffs realleges and incorporates by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

79.     The Consumers Legal Remedies Act, Civil Code §1750 *et seq.* ("CLRA") was designed and enacted to protect consumers from unfair and deceptive business practices. To this end, the CLRA sets forth a list of unfair and deceptive acts and practices in Civil Code §1770 that are prohibited in any transaction intended to result in the sale or lease of goods or services to a consumer.

80.     At all relevant times, each Plaintiff was a "consumer" within the meaning of the CLRA, Civil Code §1761(d). GOODLEAP and its agents are companies and, as such, are "persons" as that term is defined in California Civil Code §1761(c). The transaction from which this action arises was intended to result in the sale or lease of goods or services to a consumer and are covered by the CLRA.

81.     The acts and practices of GOODLEAP and its agents violated the CLRA and constitute the following unfair methods of competition and unfair or deceptive practices:

    a.  Passing off goods or services as those of another in violation of Civil Code §1770(a)(1);

    b.  Misrepresenting the source, sponsorship, approval, or certification of goods or services in violation of Civil Code §1770(a)(2);

    c.  Misrepresenting the affiliation, connection, or association with or certification by, another in violation of Civil Code §1770(a)(3);

    d.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of Civil Code §1770(a)(5);

    e.  Representing that goods or services are of a particular standard, quality, or grade, in violation of Civil Code §1770(a)(7);

    f.  Representing and advertising goods or services with the intent to not sell it as advertised in violation of Civil Code §1770(a)(9);

    g.  Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions, in violation of Civil Code §1770(a)(13);

h.  Representing that a transaction confers or involves rights and remedies which it does not have or involve, or are prohibited by law in violation of Civil Code §1770(a)(14);

i.  Representing that the subject of a transaction has been supplied in accordance with a previous transaction when it has not, in violation of Civil Code §1770(a)(16);

j.  Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer, in violation of Civil Code §1770(a)(18); and

k.  Inserting an unconscionable provision in a contract, in violation of Civil Code §1770(a)(19).

82.  GOODLEAP and its agents' violations of the CLRA present a continuing threat to Plaintiffs and the public in that GOODLEAP and its agents continue to engage in the above-referenced acts and practices.

83.  The acts and practices of GOODLEAP and its agents are willful, inattentional, and approved by managing agents as detailed above. The acts and practice have harmed Plaintiffs and Plaintiffs are entitled to an award of damages pursuant to Civil Code §1780(a) in an amount to be proven at trial.

84.  Plaintiffs have satisfied all statutory notice requirements except as may have been excused by misconduct of GOODLEAP or its agents. This Complaint shall serve as further notice of the statutory violations described therein. GOODLEAP has failed and refused to make restitution or offer Plaintiffs adequate correction, repair, relief, or other remedy.

85.  Additionally, GOODLEAP's violations of Civil Code §1770 present a continuing threat to members of the public in that GOODLEAP continues to engage in the alleged practices and has not ceased.

86.  Plaintiffs seek actual damages, an injunction, restitution, punitive damages, statutory damages, and any other relief the court deems proper pursuant to Civil Code §1780(a).

87.     Plaintiffs are also entitled to an award of attorneys' fees and costs pursuant to Civil Code §1780(d).

        WHEREFORE, Plaintiffs prays for relief as set forth below.

### THIRD CAUSE OF ACTION
**(Violation of the Fair Credit Reporting Act, 15 U.S.C. 1681, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

88.     Plaintiffs reallege and incorporate by reference as though fully herein each and every allegation contained in the preceding paragraphs.

89.     GOODLEAP used Plaintiffs' consumer reports to determine their eligibility for a loan product, and they did so without Plaintiffs' knowledge or consent, without Plaintiffs having initiated or intending to initiate any credit transaction, and without a permissible purpose.

90.     GOODLEAP's willful and/or negligent conduct also includes, but is not limited to, the following:

    a) Continuing to give sales agents access to electronic tools that allow them to obtain and/or use a consumer's credit report without the consent of the consumer;

    b) Failing to adopt policies, procedures, and practices that would prevent sales agents from obtaining or using a consumer's credit report without the consent of the consumer;

    c) Failing to supervise sales agents to ensure that they would not obtain or use a consumer's credit report without the consent of the consumer;

    d) Failing to train sales agents to ensure that they would not obtain or use a consumer's credit report without the consent of the consumer;

    e) Disregarding complaints of fraudulent or deceptive conduct and/or impermissible credit pulls by sales agents; and,

    f) Employing quotas and/or sales goals/metrics that incentivize sales agents to obtain or use credit reports without the consent of the consumer.

91.     GOODLEAP's willful and/or negligent corporate action and/or inaction of obtaining and/or using Plaintiff's consumer report proximately caused damage to Plaintiffs.

92.     Plaintiffs seek actual and compensatory damages, punitive damages, statutory damages, and any other relief the Court deems proper.

        WHEREFORE, Plaintiffs pray for relief as set forth below.

### FOURTH CAUSE OF ACTION
**(Violations of the Rosenthal Fair Debt Collection Practices Act, Civil Code §1788, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

93.     Plaintiffs reallege and incorporate herein by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

94.     The Legislature enacted the Rosenthal Act in 1976 to ensure the integrity of our banking and credit industry. Civil Code §1788.1(b). The Legislature found that "unfair or deceptive debt collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers." Civil Code §1788.1(a)(1).

95.     At all times relevant herein GOODLEAP was and is a "debt collector" within the meaning of Civil Code §1788.2(c). GOODLEAP regularly and in the ordinary course of business, on behalf of itself or others, engages in acts and practices in connection with the collection of consumer debt.

96.     The debt which GOODLEAP is attempting to collect from Plaintiffs is a "consumer debt" within the meaning of Civil Code §1788.2(f). Plaintiffs are each "debtors" within the meaning of Civil Code §1788.2(h) in that he is natural person from whom GOODLEAP sought and continue to seek to collect a consumer debt alleged to be due and owing.

97.     GOODLEAP has a non-delegable duty under the Rosenthal Act not to commit violations of the Act, and not to allow its agents to commit such violations, which duty GOODLEAP is prohibited from violating.

98.     Since November 2022, GOODLEAP has attempted to collect non-existent debts from Plaintiffs. GOODLEAP has contacted Plaintiffs by letter and phone, and collected amounts that are not owed as matter of law because Plaintiffs never entered into any contract with GOODLEAP, and furthermore lawfully rescinded any alleged contracts. Plaintiffs do not owe

any amount to GOODLEAP.

99.     GOODLEAP made false representations that Plaintiffs owed monthly payments to GOODLEAP even though Plaintiffs never had any obligation to GOODLEAP.

100.    GOODLEAP has violated the Rosenthal Act. The violations include, but are not limited to the following:

a.  GOODLEAP made and used false, deceptive, and misleading representations in an attempt to collect the fraudulent account, in violation of California Civil Code § 1788.17;[9]

b.  GOODLEAP misrepresented the character, amount, or legal status of the fraudulent account, in violation of California Civil Code §§ 1788.13(e) and 1788.17;[10]

c.  GOODLEAP misrepresented the compensation which may be lawfully received by GOODLEAP for the collection of the fraudulent account, in violation of California Civil Code §§ 1788.13(e), 1788.14(b), and 1788.17;[11]

d.  GOODLEAP is attempting to collect the fraudulent account from Plaintiffs, an action that cannot lawfully be taken, in violation of California Civil Code 1788.13(e) and 1788.17;[12]

e.  GOODLEAP misrepresented that the fraudulent account is lawfully owed by Plaintiff, in violation of California Civil Code § 1788.17;[13]

f.  GOODLEAP is attempting to collect interest, fees, or other charges from Plaintiffs that are not expressly authorized by the law agreement creating the fraudulent account or otherwise permitted by law, in violation of California Civil Code §§ 1788.13(e) and 1788.17;[14]

101.    Furthermore, GOODLEAP violated Civ. Code §1788.17, which requires every debt collector collecting or attempting to collect a consumer debt to comply with the provisions of 15 U.S.C. §1692b to §1692j of 15 U.S.C. §1692.

---

[9] 15 U.S.C. §§ 1692e and 1692e(10).
[10] 15 U.S.C. § 1692(2)(A).
[11] 15 U.S.C. § 1692e(2)(B).
[12] 15 U.S.C. § 1692e(2), 1692e(5) and 1692e(10).
[13] 15 U.S.C. § 1692e, 1692e(5), and 1692e(10).
[14] 15 U.S.C. § 1692f(1).

102.    As a proximate result of GOODLEAP's violations of the Rosenthal Act, Plaintiffs suffered damages in amounts to be proven at trial.

103.    Plaintiffs are entitled to recover his actual damages pursuant to Civil Code §1788.17, incorporating by reference 15 U.S.C. §1692k(a)(1), or in the alternative, Civil Code §1788.30(a), including, but not limited to, damages for his emotional distress.

104.    Plaintiffs are also entitled to recover statutory damages pursuant to Civil Code §1788.17, which incorporates by reference the remedies of 15 U.S.C. §1692k(a)(2)(A), or in the alternative, Civil Code §1788.30(b).

105.    Plaintiffs are entitled to attorneys' fees and costs pursuant to Civil Code §1788.17, incorporating by reference 15 U.S.C. §1692k(a)(3), or in the alternative, Civil Code §1788.30(c).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION
### (Violations of the Home Solicitation Sales Act, Civil Code §1689.5, *et seq.*)
### (On behalf of Plaintiffs Against GOODLEAP and DOES 1-20)

106.    Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

107.    The Legislature enacted the HSSA in 1971 to protect California consumers against the type of pressures that arise when a sales agent appears at a buyer's home. Regardless of whether the buyer invites the seller to his/her home, serious pressure arises from the mere fact that the seller may be an intimidating presence once inside the buyer's home. A reluctant buyer can easily walk away from a seller's place of business, but he/she cannot walk away from his/her own home and may find that the only practical way of getting the seller to leave is to agree to buy what the seller is selling.

108.    As a result, the HSSA broadly defines "home solicitation" to mean "any contract, whether single or multiple, or any offer which is subject to approval, for the sale, lease, or rental of goods or services or both, made at other than appropriate trade premises in an amount of twenty-five dollars ($25) or more, including any interest or service charges." Civil Code §1689.5(a). The definition focuses not on who initiated the contact between the buyer and the

seller, but on where the contract was made.

109.    Because of these pressures, the Home Solicitation Sales Act gives the non-senior citizen consumer the right to cancel a home solicitation contract until midnight of the third business day after the buyer receives a signed and dated copy of the contract or offer to purchase that complies with Section 1689.7. Civil Code §1689.6(a)(2). This cancellation right is extended to five days for seniors.

110.    Home solicitation sales contracts must be:

> written in the same language, e.g. Spanish, as principally used in the oral sales presentation, shall be dated, shall be signed by the buyer, and . . . shall contain in immediate proximity to the space reserved for the buyer's signature, a conspicuous statement in the size equal to at least 10-point boldface type, as follows:
>
> (B) For all buyers: "You, the buyer, may cancel this transaction at any tie prior to midnight for the third business day after the date of the transaction. See the attached notice of cancellation form for an explanation of this right.

Civil Code §1689.7(a)(1); *see also* Civil Code §1689.7(a)(4).

111.    The precise contents of the notice of cancellation are set forth in the HSSA and cannot be modified.

112.    If a seller fails to strictly comply with these notice provisions, the buyer retains the right to cancel the contract until the seller complies with the HSSA. Civil Code §1689.7(c). The seller is not entitled to any compensation. Civil Code §§1689.11.

113.    The contracts that GOODLEAP seek to enforce against Plaintiffs were purportedly entered into at Plaintiffs' home, was not entered into at an "appropriate trade premise," is a contract for "goods" and/or "services" and are regulated by and subject to the HSSA.

114.    Plaintiffs exercised their statutory right to cancel any and all contract(s) GOODLEAP contends Plaintiffs entered into and hereby further informs GOODLEAP of their cancellation of any such contract(s).

115.    If the buyer cancels, the seller must return anything the buyer paid within ten (10) days of the notice of cancellation.

116.    The buyer must make the goods available to the contractor for twenty (20) days from the

date of cancellation. If the seller fails to retrieve the goods, the buyer may keep the goods without further obligation.

117.     PEN and GOODLEAP failed to timely respond to Plaintiffs' cancellation of the non-existent contracts. In violation of the HSSA, GOODLEAP has denied Plaintiffs their statutory right to cancel.

118.     GOODLEAP violated Civil Code §1689.5, *et seq.* by failing to provide Plaintiffs with any fully executed contract signed by Plaintiffs and GOODLEAP and its agents, by failing to timely provide Plaintiffs with any notice of their statutory right to cancel, and by failing to return the amounts collected from Plaintiffs within ten (10) days of the date they exercised their statutory right to cancel any contracts GOODLEAP or its agents contend Plaintiffs entered into.

119.     Plaintiffs received no fully executed contract because they never signed a contract with GOODLEAP, much less a Spanish contract, as Civil Code §1689.7(a)(1) requires for Irma and Jose.

120.     An actual controversy exists between Plaintiff, on the one hand, and GOODLEAP, on the other hand, concerning their rights and duties under the HSSA. This controversy is ripe for adjudication. Plaintiffs are entitled to a declaratory judgment adjudicating the rights and duties of the parties under the HSSA.

121.     Plaintiffs are entitled to actual or nominal damages pursuant to Civil Code §3360 for GOODLEAP's violations.

         WHEREFORE, Plaintiffs pray for relief as set forth below.

**SIXTH CAUSE OF ACTION**
**(Violation of Business and Professions Code §7150, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

122.     Plaintiffs reallege and incorporate by reference as though fully set forth herein each and every allegation contained in the preceding paragraphs.

123.     In addition to its own violations of law, GOODLEAP is subject to all claims and defenses that Plaintiffs have against PEN as the holder in due course.

124.     Business and Professions Code §7159(d) requires that "A home improvement contract

and any changes to the contract shall be in writing and signed by the parties to the contract prior to the commencement of work covered by the contract or an applicable change order and, except as provided in paragraph (8) of subdivision (a) of Section 7159.5, shall include or comply with all of the following: (1) The name, business address, and license number of the contractor. (2) If applicable, the name and registration number of the home improvement salesperson that solicited or negotiated the contract."

125.    Business and Professions Code §7159(b) defines "home improvement contract" as "an agreement, whether oral or written, or contained in one or more documents, between a contractor and an owner or between a contractor and a tenant, regardless of the number of residence or dwelling units contained in the building in which the tenant resides, if the work is to be performed in, to, or upon the residence or dwelling unit of the tenant, for the performance of a home improvement, as defined in Section 7151, and includes all labor, services, and materials to be furnished and performed thereunder, if the aggregate contract price specified in one or more improvement contracts, including all labor, services, and materials to be furnished by the contractor, exceeds five hundred dollars ($500). "Home improvement contract" also means an agreement, whether oral or written, or contained in one or more documents, between a salesperson, whether or not they are a home improvement salesperson, and an owner or a tenant, regardless of the number of residence or dwelling units contained in the building in which the tenant resides, which provides for the sale, installation, or furnishing of home improvement goods or services."

126.    At all times relevant herein, GOODLEAP and its agents were engaged in "home improvement" under Business and Professions Code §7151 and in the sale of "home improvement goods or services" with "goods" and "services" being defined by Civil Code §1689.5.

127.    GOODLEAP alleges the existence of one or more "home improvement contracts" between GOODLEAP and/or PEN and Plaintiffs within the meaning of Business and Professions Code §7151.2.

128.    Business and Professions Code §7153(a) specifies that "[i]t is a misdemeanor for any person to engage in the occupation of salesperson for one or more home improvement contractors within this state without having, at the time of the sales transaction, a current and valid home improvement salesperson registration issued by the registrar" and "[i]t is a misdemeanor for any person to engage in the occupation of salesperson of home improvement goods or services within this state without having, at the time of the sales transaction, a current and valid home improvement salesperson registration issued by the registrar."

129.    Unbeknownst to Plaintiff, the alleged, forged, GOODLEAP and PEN contracts contained multiple violations of Bus. & Prof. Code § 7159:

130.    Subdivision (c)(3)(A): The contractor did not give the buyer a copy of the contracts signed and dated by both the buyer and the contractor. The buyers did not receive a copy of the contract that initiates the buyer's rights to cancel the contract pursuant to sections 1689.5 to 1689.14, inclusive, of the civil code.

131.    Subdivision (d): The contract was not signed by the parties to the contract prior to the commencement of the work covered by the contract or any applicable change order. *Plaintiffs did not sign any contract.*

132.    Pursuant to Business and Professions Code §7161 the following proscribed acts are considered misdemeanors:

   a)  Using false, misleading, or deceptive advertising as an inducement to enter into any contract for a work of improvement, including, but not limited to, any home improvement contract, whereby any member of the public may be misled or injured;

   b)  Making any substantial misrepresentation in the procurement of a contract for a home improvement or other work of improvement or making any false promise of a character likely to influence, persuade, or induce any person to enter into the contract; and

   c)  Any fraud in the execution of, or in the material alteration of, any contract, trust deed, mortgage, promissory note, or other document incident to a home improvement

transaction or other transaction involving a work of improvement.

133.    GOODLEAP's alleged contract contains a host of other Business and Professions Code §7161 violations not alleged herein which stem from the fact that Plaintiffs did not sign or receive the alleged contracts at the time GOODLEAP claims they became obligated on them.

134.    Liability for violations of these provisions by a home improvement salesperson extends to the contractor employing him or her. Business and Professions Code §7155.5. PEN and its salespersons acted as the agents of GOODLEAP for the purposes of the GOODLEAP Program.

135.    At all times relevant herein, GOODLEAP and its agents were under a duty to follow the law, including Business and Professions Code §§7153, 7159, and 7161. The aforementioned statutes were intended to protect against the type of harm suffered by Plaintiffs, Californians targeted by an unscrupulous home improvement salesperson for the sale of home improvement goods and services.

136.    GOODLEAP's agents breached their duty when GOODLEAP's sales agents made fraudulent misrepresentations including, but not limited to:

    a)  Concealing the fact that GOODLEAP and its agents were selling a solar installation contract and loan agreement,

    b)  Concealing the fact that GOODLEAP and its agents intended to use Plaintiff's PII to submit loan applications for Plaintiffs,

    c)  Concealing the fact that GOODLEAP and its agents were placing Plaintiffs solar installation contracts, and

    d)  Concealing the fact that GOODLEAP and its agents were placing Plaintiffs in loan agreements.

137.    GOODLEAP and its agents furthermore breached their duty by submitting a loan application for Plaintiffs, placing Plaintiffs in solar installation contracts, and placing Plaintiffs in loan agreements, all without their knowledge or permission.

138.    As a direct and legal result of the wrongful acts and/or omissions of GOODLEAP, Plaintiffs suffered harm.

139.    Business and Professions Code §7160 also creates a private right of action, allowing that "Any person who is induced to contract for a work of improvement, including but not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover from such contractor or solicitor a penalty of five hundred dollars ($500), plus reasonable attorney's fees, in addition to any damages sustained by him by reason of such statements or representations made by the contractor or solicitor."

140.    Business and Professions Code §7153(b) provides that "Any security interest taken by a contractor, to secure any payment for the performance of any act or conduct described in Section 7151 that occurs on or after January 1, 1995, is unenforceable if the person soliciting the act or contract was not a duly registered salesperson or was not exempt from registration pursuant to Section 7152 at the time the homeowner signs the home improvement contract solicited by the salesperson."

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SEVENTH CAUSE OF ACTION**
**(Violations of the Truth In Lending Act, 15 U.S.C. §1601, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

141.    Plaintiffs reallege and incorporates by reference as though fully set forth herein each and every allegation contained in the paragraphs above.

142.    The stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

143.    TILA mandates that lenders disclose certain costs of credit associated with the transaction. 15 U.S.C. § 1631(a) ("a creditor or lessor shall disclose to the person who is obligated on a consumer lease or a consumer credit transaction the information required under this subchapter").

144.    Terms such as "amount financed," "finance charge," "total of payments," and "annual percentage rate" must be used, as well as a "descriptive explanation" of each of these terms. 15

U.S.C. §1638(a)(2)-(5); Reg. Z, §1026.18(b), (d)-(e), (h).

145.    TILA mandates that these disclosures be written "clearly and conspicuously," and that "[t]he terms 'annual percentage rate' and 'finance charge' shall be disclosed more conspicuously." 15 U.S.C. §1632(a); Reg. Z, §1026.17(a).

146.    TILA also requires the disclosure of "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. §1638(a)(6).

147.    "The creditor shall make disclosures before consummation of the transaction." Reg. Z, §1026.17(b).

148.    GOODLEAP did not comply with the requirements of the TILA.

149.    GOODLEAP did not provide any Plaintiff with disclosures of the "amount financed," "finance charge," and "annual percentage rate," nor any other disclosures, as GOODLEAP did not provide any Plaintiff any loan agreements or any related disclosures contemporaneously with the alleged loan transaction.

150.    GOODLEAP violated 15 U.S.C. §§ 1632(a), 1638(a)(2)-(6), and Reg. Z, §§ 1026.17-1026.18.

151.    Plaintiffs detrimentally relied on GOODLEAP's failure to provide the above disclosures, because had these disclosures been provided to Irma or any Plaintiff, they would have immediately cut off any potential transaction with GOODLEAP instead of being left unaware that loans had been taken in their names for solar panels they never agreed to purchase.

152.    As a result of GOODLEAP's failure to provide the above disclosures, Plaintiffs suffered damages including (1) the purported $19,553 loan obligation with its finance charge of $8,492.11, and Total of Payments of $28,045.11 that GOODLEAP claims Jose and Irma are obligated on and (2) the purported $49,968 loan obligation with its finance charge of $21,707.73, and Total Payments of $71,669.73 that GOODLEAP claims Jose and Marina are obligated on.

153.    Plaintiffs seek actual and compensatory damages, punitive damages, statutory damages, attorneys' fees and costs, and any other relief the Court deems proper.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**EIGHTH CAUSE OF ACTION**
**(Violations of Business and Professions Code §17200, *et seq.*)**
**(On behalf of Plaintiffs against GOODLEAP and DOES 1-20)**

154.  Plaintiffs reallege and incorporates by reference as though fully set forth herein each and every allegation contained in the paragraphs above.

155.  Plaintiffs have standing to bring this claim because they have lost money or property as a result of the acts and practices alleged herein.

156.  The UCL defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice, and prohibits such conduct. Beginning on an exact date unknown to Plaintiff, but at all times relevant herein, GOODLEAP and its agents committed and are continuing to commit acts of unfair competition proscribed by the UCL, including the practices alleged herein.

157.  The business acts of GOODLEAP, as hereinabove alleged, constitute unlawful business practices.

158.  The business acts of GOODLEAP, as hereinabove alleged also constitute unlawful practices under federal law in at least four respects:

    a)  GOODLEAP has engaged in unfair acts and practices with regard to originating loans and servicing loans to customers who did not authorize them in violation of 12 U.S.C. §§5531(a) and 5536(a)(1)(B);

    b)  GOODLEAP has engaged in unfair acts and practices by structuring its loan origination and servicing activities in a manner that enables, facilitates and allows unauthorized loans in violation of 12 U.S.C. §§5531(a) and 5536(a)(1)(B);

    c)  GOODLEAP has violated the FCRA's Red Flags Rule by failing to develop and implement a written Identity Theft Prevention Program that is designed to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account, 16 C.F.R. §681.1(d)(1); and GOODLEAP has obtained and used consumer reports without a permissible purpose, in violation of the FCRA, 15 U.S.C. §1681b(f); and

    d)  GOODLEAP has violated Federal Trade Commission Holder in Due Course rule,

16 C.F.R. §433, *et seq*. by failing to comply with the Holder in Due Course Rule, including by refusing liability and instructing Plaintiffs that they have to deal with PEN to remedy any and all problems instead of GOODLEAP.

159.    The business acts and practices of GOODLEAP, as hereinabove alleged, constitute unfair business practices in that the acts and practices offend public policy and are substantially injurious to consumers. The acts and practices have no utility that outweighs the substantial harm to consumers.

160.    The business acts and practices of GOODLEAP as hereinabove alleged, constitute fraudulent business practices in that the acts and practices are likely to deceive the public and affected consumers as to their legal rights and obligations and avoid mandated disclosures; and by use of such deception, induce consumers to enter transactions which they otherwise would decline. The practices alleged are fraudulent and unfair, constituting deceptive practices which were predatory under the circumstances set forth herein.

161.    The unlawful, unfair, and fraudulent business acts and practices described herein present a continuing threat in that GOODLEAP and its agents are currently engaging in such acts and practices and will persist and continue to do so unless and until an injunction is issued by the Court.

162.    Pursuant to Business and Professions Code § 17203, Plaintiffs seek a public injunction for the unlawful, unfair, and fraudulent engaged in by GOODLEAP and its agents.

163.    Plaintiffs are entitled to restitution of all amounts taken by GOODLEAP and its agents.

164.    Plaintiffs are entitled to an award of attorneys' fees and costs in prosecuting this action under Code of Civil Procedure §1021.5 because:

a)      A successful outcome in this action will result in the enforcement of important rights affecting the public interest by protecting the general public from unfair, unlawful, and deceptive practices.

b)      This action will result in a significant public benefit by compelling GOODLEAP to comply with the law.

c)      Unless this action is prosecuted, GOODLEAP's activities will go unremedied and will continue unabated.

d)      Plaintiffs are individuals of modest means with limited access to the courts and the civil justice system. Unless attorneys' fees, costs and expenses are awarded against GOODLEAP, Plaintiffs will not recover the full measure of their loss.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(1)     An award of actual damages, including but not limited to, emotional distress damages;

(2)     An award of general damages;

(3)     An award of punitive damages;

(4)     An award of statutory damages;

(5)     An award of nominal damages;

(6)     An award of civil penalty;

(7)     An award of restitution;

(8)     An order finding and declaring that any alleged contracts between Plaintiffs and GOODLEAP and its agents, including PEN, have been cancelled and are void;

(9)     An order finding and declaring that the solar panels affixed to Plaintiffs' home are the property of Plaintiffs without obligation to pay for them;

(10)    An order finding and declaring that GOODLEAP's acts and practices challenged herein are unlawful, unfair, and fraudulent;

(11)    A comprehensive public injunction barring GOODLEAP from engaging in the unlawful, unfair, and fraudulent business practices challenged herein and compelling GOODLEAP to conform their conduct to the requirements of the law;

(12)    Prejudgment interest at the maximum legal rate;

(13)    An award of attorneys' fees, costs, and expenses incurred in the investigation, filing, and prosecution of this action; and

(14)    Any other and further relief as this Court shall deem just and proper.

Dated: November 7, 2023                    KEMNITZER, BARRON & KRIEG, LLP


                                    By:    /s/ *Adam J. McNeile*
                                           ADAM J. MCNEILE
                                           KRISTIN KEMNITZER
                                           MALACHI J. HASWELL

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 7, 2023                    KEMNITZER, BARRON & KRIEG, LLP


                                    By:    /s/ *Adam J. McNeile*
                                           ADAM J. MCNEILE
                                           KRISTIN KEMNITZER
                                           MALACHI J. HASWELL

# EXHIBIT A

DocuSign Envelope ID: 55A7FA8E-3E5A-4A65D-8B29-6E81563C37D4

THIS IS A COPY

# good**leap**

Our mission is to connect a world in which
**everyone can live sustainably.**

Inside this package is your payment agreement
for your upcoming home improvements.

Thank you for choosing us, and one of our trusted
partners, to help you upgrade your home.

67251d6d-f30b-4b4a-9ea7-6a5a504c5ab6

# good
for life, earth, and prosperity

DocuSign Envelope ID: 55A7FA9F-3E5A-4C5D-8B29-8E81563C37D4

THIS IS A COPY
Unauthorized Copy of this record made at MY.docusign.net

# goodleap

Key Loan Terms

In this package, you will be signing your loan agreement with the following terms:

| Loan Amount | Loan Term | Interest Rate/APR |
|---|---|---|
| **$19,553.00** | **25 years** | **2.99%** |

| DS | DS |
|---|---|
| **JDM** | **IB** |
| Borrower's Initials | Co-Borrower's Initials |

| Initial Payment | |
|---|---|
| **$66.69 (e) / month** | Your initial GoodLeap monthly payment for the first 18 months. |

| Adjusted Monthly Payment | |
|---|---|
| **$95.67 (e) / month** | Your adjusted GoodLeap monthly payment starting in month 19 until the end of your loan term if no voluntary payments are made in the first 18 months. |
| | Your loan is designed to re-amortize at the end of the 18th month. If you choose to make voluntary prepayments on your loan equal to 30% of your loan amount before the end of the 18th month, your loan payment will stay approximately the same as your initial monthly payment throughout the life of your loan. If you do not make a voluntary prepayment, your monthly loan payment will go up to the adjusted amount. |

"(e)" means "Estimate"

Your loan start date is the date we fund the loan to your Contractor. Interest on your loan begins to accrue on the loan start date.

Your first payment date will be due approximately 90 days after your loan start date. Your first payment date may be before your system has been granted Permission to Operate from your utility company.

Borrower's signature: Jose david Murillo    Date: Sep 1, 2022
4D3F026496274C0...

Co-Borrower's signature: Irma Barrios    Date: Sep 1, 2022
4D3F026496274C0...

If you have any questions about your loan or your loan terms after reviewing this package, please call GoodLeap at 1 (844) 910-0111.

DocuSign Envelope ID: 55A7EABF-356A-4CE0-8B20-8E81563C37D4

THIS IS A COPY
The Authoritative Copy of this record is held at na3.docusign.net



Notice to Cosigner

If you do not own the home where this installation is to occur and you are not married to someone who does, you are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.



DocuSign Envelope ID: 55A7FABE-3ECA-4C5D-8B20-6E81563C37D4

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**GOODLEAP**

8781 Sierra College Blvd, Roseville, CA 95661   Phone: 1-877-290-9991

## Truth in Lending Disclosure Statement

**Borrower:** Jose david Murillo
**Co-Borrower:** Irma Barrios
**Email:** ▮▮▮▮▮
**Phone:** (818)▮▮▮▮
**Loan Agreement Number:** ▮▮▮3828

**Residence Address:**
▮▮▮▮▮
RESEDA, CA 91335

**Date of the Agreement:** Sep 1, 2022

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| **2.99%** | **$8,492.11 (e)** | **$19,553.00** | **$28,045.11 (e)** |

| Monthly Payment Schedule | | |
|---|---|---|
| **Number of Payments** | **Amount of Payments** | **When Payments Are Due** |
| 1 | $66.69 (e) | Monthly, beginning 3 months after the Loan Start Date **(e)** |
| 15 | $66.69 (e) | Monthly, beginning 4 months after the Loan Start Date **(e)** |
| 281 | $95.67 (e) | Monthly, beginning 19 months after the Loan Start Date **(e)** |
| 1 | $94.80 (e) | **300 months after the Loan Start Date (e)** |
| | "(e)" means an estimate | |

| | |
|---|---|
| **Autopay – Variable Rate:** | The Annual Percentage Rate (APR) and Monthly Payment Schedule above are based, in part, on the Autopay payment option you selected in the loan application. You may change your Autopay payment option at any time. Selecting Autopay payments provides a 0.50% interest rate/APR discount and a lower monthly payment. Cancelling Autopay payments will raise your interest rate/APR by 0.50% and will result in a higher monthly payment. |
| **Security:** | You are giving a security interest in the personal property you are purchasing in this transaction and your rights under any related agreement. |
| **Prepayment:** | If you pay off your loan early, you will not have to pay a penalty. |
| **Contract Reference:** | See your Loan Agreement ("Agreement") for any additional information about nonpayment, default, and any required repayment in full before the scheduled date. |

| Itemization of Amount Financed | |
|---|---|
| **Itemization of the amount financed:** | $19,553.00 |
| Amount given to you directly: | $0 |
| Amount paid to others on your behalf: | $19,553.00 to Pacific Energy Network, LLC |

The "Loan Start Date" is the date we send funds to your contractor. This date must be within 180 days of the initial application date.

This loan is assumable upon the sale of the property to a new owner, if the new home owner qualifies under GoodLeap's underwriting guidelines.

The Payment Schedule shown above assumes that you make no voluntary prepayments on your Loan. However, we have designed the Loan so that it will re-amortize at the end of the 18th month after your Loan Start Date. As a result, if you make all scheduled payments on time and also make sufficient voluntary prepayment(s) to reduce your total loan amount to the "Target Balance" by the "Target Balance Date" described in your Agreement, your payments from month 19 through the end of your term will be approximately equal to your initial monthly payment stated above.

Your Contractor may have opted to pay GoodLeap a fee in order for GoodLeap to offer you credit on the terms in this Agreement. Your purchase price set by the Contractor may include your Contractor's various costs, including this fee.

The Payment Schedule shown above assumes you make no changes to your Autopay payment option. For example, your 25 year loan of $19,553.00 with Autopay payments will have an interest rate/APR of 2.99% and an initial monthly payment of $66.69 (e)

THIS IS A COPY
No authorized Copy of this record is held at NNS.docusign.net

per month. Your 25 year loan of $19,553.00 without Autopay payments will have an interest rate/APR of 3.49% and an initial monthly payment of $70.65 (e) per month.

**By signing below, you acknowledge that you have read and received a complete copy of this disclosure to keep for future reference before you signed your Agreement.**



Borrower's Signature: _Jose david Murillo_____     Date: _Sep 1, 2022_

Co-Borrower's Signature: _Irma Barrios_____     Date: _Sep 1, 2022_

GoodLeap, LLC:

**Matt Dawson, Co-Founder**

COPY VIEW

DocuSign Envelope ID: 55A7FABE-3ECA-4C5D-8B20-6E81563C37D4

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**GOODLEAP**
8781 Sierra College Blvd, Roseville, CA 95661   Phone: 1-877-290-9991

## Loan Agreement

Borrower: Jose david Murillo
Co-Borrower: Irma Barrios
Email: [redacted]
Phone: (818) [redacted]
Loan Agreement Number: [redacted] 3828

Residence Address:

RESEDA, CA 91335

Date of the Agreement: Sep 1, 2022

This document provides a Summary of the terms and conditions of your Loan.

### SUMMARY OF LOAN TERMS AND PAYMENTS

| 25 YEARS | $19,553.00 | $66.69 (e) | 2.99% | $13,496.45 (e) | May 01, 2024 (e) | $95.67 (e) |
|---|---|---|---|---|---|---|
| LOAN TERM | TOTAL LOAN AMOUNT | INITIAL MONTHLY PAYMENT | INTEREST RATE / APR | TARGET BALANCE | TARGET BALANCE DATE | ADJUSTED MONTHLY PAYMENT* |

(e) means estimate
   * Adjusted monthly payment assumes that no prepayment was made and the Target Balance was not met by the Target Balance Date, and you do not change the Autopay payment election.

### SYSTEM INFORMATION

Installation Contractor: Pacific Energy Network, LLC

Purchased Goods under this Loan Agreement will be detailed in your Home Improvement Agreement with your Contractor.  By initialing below, you confirm receipt of such Home Improvement Agreement.

Borrower's Initials: ___JDM___   Co-Borrower's Initials: ___IB___

### LOAN INFORMATION

**Loan Start Date and First Payment Date**

The "Loan Start Date" and "First Payment Date" will be finalized in your Loan Closing Certificate (Exhibit A), an example of which is fully incorporated herein. This certificate will be sent to you following disbursement of the loan proceeds.

**The "Loan Start Date" will be the date that we disburse loan proceeds to your Contractor.**

**The "First Payment Date" will be set by us as follows: If the Loan Start Date is on the 1st through 28th, it will be on the corresponding date 3 months later (i.e., if June 15th, then September 15th); if the Loan Start Date is on the 29th through 31st, it will be on the first day of the first month following 90 days after the Loan Start Date (i.e., if June 30th, then October 1st).  You are obligated to make all loan payments starting on your First Payment Date, regardless of the utility company granting permission to operate.**

Borrower's Initials: ___JDM___   Co-Borrower's Initials: ___IB___

Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the first calendar day following the Loan Start Date.  Thus, the longer your First Payment Date is from the Loan Start Date, the more interest you will pay. If you wish to reduce the amount of interest that accrues, you can begin making payments earlier, at any time you choose after the Loan Start Date.  However, interest will continue to accrue until all amounts owed under this Agreement are paid in full.

Your loan application was approved for a period of 180 days from the initial credit report date. If the Loan Start Date does not occur within 180 days from the initial credit report date, we will request a new credit report from the credit bureaus, to make sure that you continue to qualify for the same loan terms. This may impact your credit score.

**Tax Credit**

You may be eligible for a federal solar investment tax credit. You acknowledge that eligibility for this tax credit is not guaranteed. In order to realize the benefits of the solar investment tax credit, you must have federal income liability that is at least equal to the value of the credit. We are not financially responsible for your receipt of any tax credits related to the Solar Equipment. We do not provide tax advice and nothing in this Loan Agreement is intended to be used as tax advice. To determine your eligibility for any federal solar investment tax credit, you should make an independent assessment or consult with your tax advisor.

**Target Balance Payments and Initial Monthly Payments**

You are not required to make prepayments. However, you acknowledge that in order to avoid an increase in your Initial Monthly Payment, you must make one or more voluntary prepayments equal to 30% of your Total Loan Amount by your Target Balance Date. If you pay more than 30% of your Total Loan Amount, your monthly payments will be adjusted to a lower amount than the Initial Monthly Payment. If you do not make any prepayments, or if your prepayments are less than 30% of your Total Loan Amount, your monthly payments will be adjusted to a higher amount than the Initial Monthly Payment.  You also understand that your Initial Monthly Payments will not be fully amortizing, but your new Monthly Payment after the Target Balance Date will be fully amortizing.

Borrower's Initials: ___JDM___   Co-Borrower's Initials: ___IB___

**Security Agreement**

You authorize us to file on your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and/or a county fixture filing required to perfect our security interest in the Collateral to the extent required by applicable law, as outlined in Section 6 of this Agreement.

**FOR MASSACHUSETTS BORROWERS ONLY: You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.**

### LOAN AGREEMENT

THIS IS A COPY
Unauthorized copy of this record is prohibited na3.docusign.net

THIS AGREEMENT IS LEGALLY BINDING AS OF AND FOLLOWING THE DATE OF THIS AGREEMENT. IN THIS AGREEMENT, THE WORDS "YOU" AND "YOUR" REFER TO BORROWER, CO-BORROWER AND BORROWER'S AND/OR CO-BORROWER'S PERMITTED ASSIGNEES, AND THE WORDS "LENDER," "WE," "US" AND "OUR" REFER TO GOODLEAP OR ITS ASSIGNEES. THIS AGREEMENT SUPERSEDES ANY PRIOR AGREEMENT BETWEEN YOU AND US CONCERNING THE SAME SUBJECT MATTER.

1.   **INTRODUCTION.**  The parties (each, a "Party" and collectively, "Parties") to this Agreement are you and GoodLeap, LLC ("GoodLeap"). Your solar installation contractor ("Contractor") has provided us with a copy of a signed home improvement agreement between you and the Contractor (the "Home Improvement Agreement") under which the Contractor will install solar panels, inverters, charging stations, wiring, electrical and mechanical connections, metering, monitoring and/or other distributed generation interconnect equipment ("Solar Equipment") and may, in addition or instead, install new roofs and related roofing materials, battery storage equipment, electrical vehicle power charging equipment, and thermostat equipment, and provide landscaping services to accommodate the solar system (together with the Solar Equipment, "Purchased Goods") at your home ("Residence") located at the Residence Address listed above.

2.   **PROMISE TO PAY.**  For value received, you promise to pay to GoodLeap and/or its assignees, the principal sum of the Total Loan Amount, with interest as set forth in Section 3 ("Interest and Payments") and any fees assessed in Section 4 ("Fees") below.

3.   **INTEREST AND PAYMENTS.**

a.   <u>Payment Timing</u>.  Your first Monthly Payment is due and payable on the First Payment Date (estimated on the Truth in Lending Disclosure and finalized on the Loan Closing Certificate).

b.   <u>Payment Application</u>.  If you make a payment that satisfies all current and past due installments, any additional payment will be allocated as set forth in the following sentence, but that additional payment will not change the due date for any payment that comes due in the future. To the extent permitted by applicable law, all payments or prepayments will be applied first to accrued interest, then to unpaid principal in the inverse order of maturity (last to first), and then to fees or costs payable to us under this Agreement.

c.   <u>Accrual</u>.  Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the first calendar day following the Loan Start Date. Interest will continue to accrue until all amounts owed under this Agreement are paid in full.  Unpaid interest will not be added to the principal balance.  To the extent permitted by applicable law, interest on your loan will be calculated on a 30/360 basis. For any partial month, interest accrues based on the actual number of days your loan is outstanding for such partial month. If you make your loan payments late, more interest will accrue, and the total finance charge you pay over the life of your loan will be higher. If you make your loan payments early, less interest will accrue, and the total finance charge you pay over the life of your loan will be less. Interest accrues between the Loan Start Date and your First Payment Date, and the longer the period of time between the Loan Start Date and your First Payment Date, the more interest will accrue.  If you wish to reduce the amount of interest that accrues before your First Payment Date, you can begin making loan payments any time after the Loan Start Date. The amount of your final loan payment will change based on when you pay your monthly loan payments and whether you make any voluntary prepayments.

d.   <u>Interest rate and Monthly Payment Amounts</u>.  Your interest rate may vary depending upon only whether you cancel or add Autopay payments during the term of your loan, with a 0.50% interest rate discount for Autopay, or removal of that discount without Autopay. The monthly payments you must make, assuming you make all payments in full and on time and do not change your Autopay payment election, are set forth in your Loan Closing Certificate based upon your prior Autopay election. If there is a change to your Autopay status the new interest rate and accrual will be reflected in your monthly payment for the next applicable billing cycle.

e.   <u>Target Balance / Target Balance Date / Initial Monthly Payment / New Monthly Payment</u>:  After the Target Balance Date, your loan will re-amortize to reflect your outstanding principal balance on the Target Balance Date and your new Monthly Payments will be adjusted to an amount required to cause the full repayment of the Loan by the Maturity Date.  You understand that your Initial Monthly Payments will not be fully amortizing, but your new Adjusted Monthly Payments after the Target Balance Date will be fully amortizing and will be calculated as follows:

(i)   If you do not make <u>any</u> voluntary prepayments before the Target Balance Date, then your new Monthly Payment will be the Adjusted Monthly Payment.

(ii)   If you make voluntary prepayments but such prepayments do not reduce your Total Loan Amount equal to or below the Target Balance by the Target Balance Date, then your new Monthly Payment will be an amount greater than your Initial Monthly Payment but less than the Adjusted Monthly Payment.

(iii)   If you make voluntary prepayments and such prepayments reduce your Total Loan Amount equal to the Target Balance by the Target Balance Date, then your new Adjusted Monthly Payment will be approximately equal to your Initial Monthly Payment.

(iv)   If you make voluntary prepayments to reduce your unpaid Total Loan Amount to less than the Target Balance by the Target Balance Date, then your new Adjusted Monthly Payment will be less than the Initial Monthly Payment reflected in the Loan Summary above for the remainder of the Term.

f.   <u>Maturity Date</u>.  Unless your loan is due earlier and payable as provided in this Agreement, your loan will mature on the Maturity Date.  On the Maturity Date, you agree to pay in full any unpaid amounts payable under this Agreement.

g.   <u>Payment Method</u>.  You may pay by Autopay or check. If you chose to pay by Autopay in your application, you agree to complete and submit the Automatic Payment Authorization Form (the "Autopay Authorization"). If you chose to pay by check, include your Loan Agreement Number on your check and mail it to GOODLEAP, PO BOX 4387, Portland, OR 97208.  You may change your payment method by following the instructions in the Autopay Authorization.

h.   <u>Prepayment</u>. You may prepay your loan at any time without penalty.

4.   **FEES.**  We will also charge you the following fees to the extent permitted by applicable law.

a.   <u>Insufficient Funds Fee</u>. Unless prohibited by law, you will be charged a non-refundable fee of $15 for each failed electronic or check payment attempt. Your bank may assess its own fee in addition to the fee we assess.

b.   <u>Fee for the Removal and Refiling of Our County Fixture Filing</u>.  See Section 6 below for further information.

c.   <u>Transfer Fee</u>. See Section 6 below for further information.

d.   <u>Alternative Payment Convenience Fee</u>.  Where permitted by law, if you request that we accept a payment via an alternative source such as a debit card, you may be charged a convenience fee, in an amount that we will disclose prior to your election to pay by such alternative method.

5.   **ADDITIONAL OBLIGATIONS AND REPRESENTATIONS.**

a.   <u>Collateral</u>. To the extent permissible by law, you irrevocably grant us a limited power of attorney with full power of substitution and re-substitution, to sign any documents and perform any acts, in your name and on your behalf, for the exclusive purpose of exercising our rights with respect to the Collateral under this Agreement. You also agree not to pledge, mortgage, encumber or otherwise permit the Collateral at any time to be subject to any lien or encumbrance that is superior to our security interest. See Section 6 below for further information on what constitutes eligible Collateral under this Agreement.

THIS IS A COPY
Case 2:23-cv-09382-HDV-MAA   Document 1   Filed 11/07/23   Page 46 of 85   Page ID #:46
Unauthorized copy of this record is held at D3.docusign.net

DocuSign Envelope ID: 55A7EABE-356A-4CFB-8B20-8E81563C37D4

b.   Ownership Confirmation.  You represent and covenant that: (1) the Residence is your primary residential home dwelling or a second/vacation home and is not a rental property, or any business or commercial establishment or used as such; (2) you, or a trust controlled by you, are the fee simple owner of the Residence and the Collateral; (3) you are not, and will not, be in breach of your Home Improvement Agreement.

c.   Collateral Access. You agree to provide us or our designees after receiving reasonable notice, with access to the Residence for the purposes of (1) inspecting the Purchased Goods until this Agreement terminates or, (2) in the case of a foreclosure on the Collateral, removing the Collateral from the Residence.

d.   Personal Property. You and we both expressly intend that no portion of the Collateralized Goods will constitute a "fixture" attached to any real property, and that the Collateralized Goods will be removable personal property. You also agree not to take any action that might cause the Collateralized Goods to be treated as real property or as fixtures to real property. You agree that we may make a fixture filing, if we choose, provided that you and we agree that we may enforce rights in the Collateralized Goods under the Uniform Commercial Code and not under state real estate or mortgage law.

e.   Installation and Maintenance. You will take all steps necessary to enable the installation and proper functioning of the Purchased Goods to be completed in accordance with the Home Improvement Agreement and to be maintained in accordance with any Operations and Maintenance Agreement. You agree to keep the Purchased Goods in good working order and in compliance with manufacturing specifications, the operating and maintenance manuals, warranty requirements provided by your Installation Contractor and, if applicable, your Operations and Maintenance Contractor, and all applicable law, and not to remove or modify the Purchased Goods without our prior written consent.  You agree to maintain at all times an internet connection sufficient to ensure that monitoring data for the Solar Equipment can be fully transmitted, and consent to GoodLeap receiving such monitoring data, directly or through Contractor.  You will be responsible for the structural integrity of the location where the Purchased Goods are installed, including structural or electrical modifications necessary to prepare your Residence for the Purchased Goods.

f.   Property Conditions.  You agree that GoodLeap is not responsible for any known or unknown Residence conditions.  GoodLeap is not responsible and bears no liability for the malfunctioning of existing electrical equipment at the Residence, including but not limited to the main electrical service panel, any major electrical devices, or any other fuses or similar devices.

g.   Taxes. You agree to pay, when due, your taxes, assessments, or other similar fees. If you do not pay these taxes or other fees when due, we may pay them on your behalf and add the amount we pay to the principal of our loan under this Agreement. In the event that we choose pay these taxes and/or other fees on your behalf, you agree to assist us in these efforts.  Tax obligations that you may be required to pay may include: (1) the assessed value and the property tax assessments associated with the Purchased Goods calculated in the year this Agreement is signed; (2) transaction privilege taxes; and (3) any obligation to transfer tax credits or tax incentives of the Purchased Goods to any other person.

h.   Required Insurance. To the extent permissible by law, you agree to maintain and pay any deductibles under a homeowners' insurance policy or equivalent insurance policy reasonably acceptable to us covering the Purchased Goods in an amount equal to the full replacement and installation cost of the Purchased Goods or the outstanding balance of the loan. If there is a payout under the property coverage for damage to the Purchased Goods, you agree to deliver those insurance proceeds to us, and we will apply those proceeds to the loan in the order of priority set forth in Section 3b. of this Agreement.

i.   Credit Inquiries. You authorize us to obtain a credit report on you for any legal purpose in connection with this loan, including any update, extension of credit, review, or collection of this loan. Upon request, we will tell you the name and address of the credit bureau furnishing any report.

j.   Bankruptcy. You represent that you are not contemplating bankruptcy and that you have not consulted with an attorney regarding bankruptcy in the past six months. Any communication with us required or permitted under the Federal Bankruptcy Code must be in writing, must include your loan number, and must be sent to us at the address for GoodLeap.

**6.   GRANT OF SECURITY INTEREST IN COLLATERAL.**  As consideration for the loan we are providing and to secure your obligations under this Agreement, you hereby grant to us a security interest in the following property (collectively "Collateral"):

a.   all Purchased Goods excluding the roof and related roofing materials, if any (such Purchased Goods which excludes the roof and related roofing materials are referred to in this Agreement as "Collateralized Goods");

b.   all accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to the Collateralized Goods;

c.   all proceeds from warranty claims related to the Collateralized Goods, the Home Improvement Agreement and any Operations and Maintenance Agreement;

d.   all your rights, title, interests, and remedies under all agreements and other documentation relating to the Collateralized Goods (including, without limitation, the Home Improvement Agreement, and Operations and Maintenance Agreement);

e.   all consideration received from the collection, sale or other disposition of the Collateralized Goods, including any payment received from any insurer arising from any loss, damage or destruction of any Collateralized Goods and any other payment received as a result of possessing any Collateralized Goods, or any other proceeds of Collateralized Goods.

You authorize us to file on your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and a county fixture filing to perfect our security interest in the Collateralized Goods (in case a third party seeks to classify the panels as a fixture). If you are refinancing your home, upon request, we may agree to lift our county fixture filing, on the Solar Equipment for a limited period of time, provided we will be able to refile upon closing of the mortgage refinancing.  A $200 fee will be assessed for the removal and refiling of our county fixture filing.   If you sell your home, your loan must be paid in full to remove the UCC financing statement and county fixture filing. The actual costs incurred, if any, of removing a UCC financing statement or country fixture filing will be added to your payoff amount if you elect to pay your loan in full before the end of the loan term. Alternatively, this loan agreement may be transferred to the new home owner if the new home owner qualifies for the loan product as outlined in Section 12.  A $300 transfer fee will be assessed for any transferred loan agreements.

**7.   INDEMNIFICATION.**  You agree to indemnify, defend and hold harmless us and our affiliates against any loss, liability, or damage that arises out of or relates to the transactions contemplated by this Agreement.

**8.   DEFAULT.** You will be in default under this Agreement if any of the following occurs:

a.   you fail to make any payment under this Agreement within fifteen (15) days of the date such payment is due;

b.   you fail to perform any of your obligations under this Agreement and you fail to cure such failure to perform to our reasonable satisfaction within thirty (30) days after receiving notice from us of your failure to perform;

c.   you terminate the Home Improvement Agreement without our consent after any loan proceeds have been disbursed;

d.   you remove, modify, sell or otherwise transfer the Collateral without our approval;

e.   any representation made by you on your loan application or this Agreement is false in any material respect when made;

f.   any of the following occurs (each a "Bankruptcy Event"): (1) you make an application for the appointment of a receiver, trustee or custodian or a receiver, trustee or custodian is appointed for you or a majority of your assets; (2) you initiate or consent to any legal proceedings under the Bankruptcy Code, or equivalent law providing for the relief of debtors; (3) you make an assignment for the benefit of creditors; or (4) you have a petition in bankruptcy or similar relief of debtors filed against you, which is not withdrawn or discharged within thirty (30) days of being filed.

**9.    REMEDIES.** Our remedies if you default on this Agreement include the following (to the fullest extent permitted by law):

a.    General.  In the event that you are in default under this Agreement, we may:

(1)    Accelerate your Loan:  We would declare our loan immediately due and payable. This requires you to pay in full the unpaid principal amount of the loan, all accrued interest, and any other amounts due under this agreement.  Your loan will become immediately due and payable to us under a Bankruptcy Event, regardless of whether or not we take any action.

(2)    Provide a report to the credit bureaus detailing any late payments, missed payments or other defaults:  As required by law, you are hereby notified that a negative report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of this Agreement.

(3)    Disable / Foreclose on the Collateral: (and exercise any other rights with respect to the Collateral that we have under this Agreement or applicable law). This includes disabling the Equipment remotely or by entering upon your property; and/or entering upon your property and removing and taking possession of the Collateral and then selling, leasing, or otherwise disposing of the property.

(4)    Pursue all remedies available under applicable law:  Including those of a secured creditor as permitted by applicable law.

(5)    Stop making credit extensions under your loan:  Including ceasing any funding that may be pending on your loan as permitted by applicable law

b.    Cost Reimbursement; Application of Proceeds.  Unless otherwise prohibited by state law, you are to promptly reimburse us, with interest, for all costs and expenses incurred in exercising our remedies related to this Agreement. If we choose to foreclose on the Collateral, we will apply any cash proceeds in the order of priority set forth in Section 3b. of this Agreement and then to you or as a court may otherwise direct.

c.    Deficiency Judgment.  To the fullest extent permitted by law we may require that you pay any amounts payable by you under this Agreement less any proceeds that we realize from our exercise of our remedies under this Agreement.

TO THE FULLEST EXTENT PERMITTED BY LAW, YOU ARE PERSONALLY LIABLE FOR ALL AMOUNTS PAYABLE UNDER THIS AGREEMENT. WE ARE NOT REQUIRED TO FORECLOSE ON THE COLLATERAL BEFORE INITIATING PROCEEDINGS AGAINST YOU AND YOUR ASSETS.

Our rights under this Agreement are cumulative and we may exercise these rights at any time if you default. In the event that we exercise any of our rights or remedies under this Agreement, you will continue to be in default until such time that you pay to us all amounts due and payable to us and you have cured any and all defaults. OUR FAILURE TO TAKE ANY ACTION OR DELAY TAKING ANY ACTION RELATED TO YOUR DEFAULT, OR SIMILAR OR UNRELATED DEFAULT, DOES NOT WAIVE, OR IMPLY A WAIVER OF ANY OF OUR RIGHTS UNDER THIS AGREEMENT.

**10.    TERMINATION.** We may terminate this Agreement during any period in which a Force Majeure Event prevents, limits or otherwise impairs our ability to perform our obligations under this Agreement. A Force Majeure Event means any circumstance beyond the Parties' reasonable control, including but not limited to any act of nature, war, terrorism, rebellion, labor dispute, work stoppage, civil disorders, act of government, or any other similar major cause.  This Agreement will terminate automatically if the final loan disbursement does not occur within one hundred eighty (180) days of the date you most recently received credit approval by us to enter into this Agreement.  No delay in our exercise of the foregoing termination rights shall constitute a waiver of our continuing rights to terminate the Agreement.  In addition, you may terminate this Agreement at any time prior to our disbursement of the loan proceeds, by sending advance written notice to us.  The terms of this Agreement that would, by their express nature, survive the termination of this Agreement will survive and be enforceable under this Agreement. Upon termination of this Agreement, our security interest in the Collateral will terminate.

**11.    NOTICES AND OTHER INFORMATION.** You agree to notify us if your name, email, or mailing address changes.

**12.    ASSIGNMENT/REGISTERED FORM.** You may not assign or transfer your rights or obligations under this Agreement without our prior written consent, provided, that if you sell your home, you may transfer the loan obligations to the new home owner if (a) they meet our credit and underwriting criteria in place at that time by notifying us in writing at least thirty (30) days in advance using the contact information noted at the top of this Agreement, and (b) the warranties and operations and maintenance service obligations (if any) pertaining to the Purchased Goods are transferred to the new home owner.  We reserve the right to not allow assignment of the loan in cases where you are in default under this Agreement. You agree that we may assign or transfer all or a portion of this Agreement and the related documents to any third party or affiliate. GoodLeap or its agent, acting as a non-fiduciary agent of the Borrower, shall maintain, a register within the meaning of U.S. Treasury Regulations Sections 5(f).103-1(c) on which it will record the names and addresses of each owner and their rights to principle and stated interest.  Any transfer of all or a portion of a beneficial interest hereunder shall be recorded on such register.  All parties to this agreement or their agents may treat each person or entity whose name is recorded in such register pursuant to the terms hereof as the applicable participant for all purposes under this Agreement.  The register shall be available for inspection from time to time by any party hereto upon reasonable prior notice to GoodLeap or any of its agents. YOU AUTHORIZE US TO PROVIDE TO A THIRD PARTY OR AFFILIATE ANY INFORMATION THAT THEY MAY REQUEST IN CONSIDERING OR IMPLEMENTING A PURCHASE OF OUR RIGHTS UNDER THIS AGREEMENT.   Arizona borrowers only: we will notify you if the entity responsible for allowing the assignment of your loan changes.

**13.LIMITATION OF LIABILITY.**  TO THE EXTENT PERMITTED BY APPLICABLE LAW, OUR LIABILITY TO YOU UNDER THIS AGREEMENT, IF ANY, SHALL BE LIMITED TO DIRECT, ACTUAL DAMAGES ONLY. YOU AGREE THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL OR INDIRECT DAMAGES.

**14.    GOVERNING LAW AND MISCELLANEOUS.**

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Except for the Arbitration agreement below, this Agreement shall be governed by federal law and, to the extent state law applies, the substantive laws of the state where the Residence is located. If any provision of this Agreement cannot be enforced, the rest of this Agreement will stay in effect. No amendment of this Agreement will be valid unless in writing and signed by both Lender and you (the Loan Closing Certificate shall not be deemed an amendment of this Agreement and is fully incorporated into this Agreement). This Agreement represents the entire agreement between the Parties regarding your loan.  Our rights under this Agreement shall inure to the benefit of our successors and assigns, and your obligations under this Agreement shall be binding upon your heirs, personal representatives and permitted assigns.

**15.    ARBITRATION AGREEMENT.  All claims and disputes arising out of or relating to this Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis. The arbitrator shall also decide any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, "arbitrability" issues). YOU HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JURY.  FURTHER, UNLESS YOU OPT OUT OF ARBITRATION, YOU ALSO AGREE TO WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION IN COURT OR IN ARBITRATION. The arbitrator shall have the authority to award any relief, including injunctive relief, which is available under applicable law. Each party shall bear the expense of its own counsel, experts, witnesses and preparation and presentation of proofs. However, the arbitrator may award you reasonable attorney's fees and costs if this is expressly authorized by applicable law. Upon request, we will pay a portion of the fees and expenses of the arbitrator and the administrative fees and expenses of**

DocuSign Envelope ID: 55A7EABE-356A-4CBB-8B20-8E81563C37D4

THIS IS A COPY
of a document executed electronically, and is an authorized copy of this record, held at GOODA3.docusign.net

the arbitration. The arbitrator shall issue a written award describing the essential findings supporting the award. All hearings in the arbitration shall take place within the federal judicial district where the Residence is located; the arbitrator's award shall be final and judgment on the arbitrator's award may be entered by the federal District Court. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules (the "Rules"). A copy of the JAMS Streamlined Arbitration Rules can be obtained from JAMS at https://www.jamsadr.com/rules-streamlined-arbitration or (800) 352-5267. The arbitrator shall be selected from the JAMS panel of neutrals and shall be a retired federal judge, a retired state appellate judge, or a retired state trial judge (in that order of preference). You agree that this agreement to arbitrate may be enforced by us or our affiliates, subsidiaries, or parents, and (g) each of their officers, employees, and agents. This arbitration agreement is made pursuant to a transaction involving interstate commerce. The Federal Arbitration Act (9 U.S.C. §§1-16) (the "FAA") shall govern this agreement to arbitrate including all arbitrability issues. No state law respecting arbitrability issues shall govern this agreement to arbitrate. Subject to and without limiting the foregoing, federal law shall apply to all other issues that arise under federal law and applicable state law as set forth in Section 14 above shall apply to all other issues that arise under state law (without reference to a state's choice of law rules). YOU MAY OPT OUT OF ARBITRATION BY SENDING US WRITTEN NOTICE WITHIN 15 DAYS OF SIGNING THE AGREEMENT STATING THAT YOU WISH TO "OPT OUT OF THE AGREEMENT TO ARBITRATE DISPUTES." THE OPT-OUT NOTICE SHOULD BE SENT TO THE FOLLOWING ADDRESS: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661. If you do not opt out, but any part or parts of your agreement to arbitrate are unenforceable then GoodLeap and you agree that such specific part or parts shall be of no force or effect and shall be severed, but the remainder of this agreement to arbitrate shall continue in full force and effect. If, however, the entire agreement to arbitrate or your waiver of the right to participate in class, representative or to arbitrate injunctive relief claims is unenforceable then the agreement to arbitrate shall be of no force or effect.

JUDICIAL REFERENCE FOR CALIFORNIA BORROWERS. IF THE RESIDENCE IS IN CALIFORNIA AND YOU OPT-OUT OF ARBITRATION, GOODLEAP AND YOU AGREE THAT ANY DISPUTES WILL BE RESOLVED IN THE SUPERIOR COURT FOR THE COUNTY IN A GENERAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), § 638(a). YOU ACKNOWLEDGE AND AGREE THAT IN A REFERENCE ACTION, ANY DISPUTE WILL BE HEARD BY A REFEREE AND NOT BY A SUPERIOR COURT JUDGE AND JURY AND HEREBY WAIVES HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO HAVE A TRIAL IN FRONT OF A JUDGE AND JURY. The Referee shall be appointed pursuant to CCP § 640 in the absence of agreement on the selection. The Referee shall have the same qualifications as the arbitrator. Upon request, GoodLeap will pay your portion of the fees and expenses of the Referee.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF THE RESIDENCE IS IN CALIFORNIA AND YOU DO NOT OPT-OUT OF ARBITRATION, YOU MAY SEEK PUBLIC INJUNCTIVE RELIEF IN ARBITRATION TO THE EXTENT PERMITTED BY APPLICABLE LAW. IF, HOWEVER, ARBITRATION IS UNENFORCEABLE, IN WHOLE OR IN PART, THEN GOODLEAP AND YOU AGREE THAT SUCH DISPUTES WILL BE RESOLVED IN THE SUPERIOR COURT FOR THE COUNTY IN A GENERAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), § 638(a). YOU ACKNOWLEDGE AND AGREE THAT IN A REFERENCE ACTION, ANY DISPUTE WILL BE HEARD BY A REFEREE AND NOT BY A SUPERIOR COURT JUDGE AND JURY AND HEREBY WAIVES HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO HAVE A TRIAL IN FRONT OF A JUDGE AND JURY. The Referee shall be appointed pursuant to CCP § 640 in the absence of agreement on the selection. The Referee shall have the same qualifications as the arbitrator. Upon request, GoodLeap will pay your portion of the fees and expenses of either the arbitrator or the Referee, as the case may be, any your portion of any administrative fee that the arbitrator, referee or JAMS may require.

Nothing in Section 15 shall prejudice the right of either party to: (a) seek and obtain such provisional relief or remedies as shall otherwise be available judicially pending appointment of the arbitrator or referee (b) bring their Dispute in small claims court on an individual basis, (c) exercise such self-help remedies as are authorized by law or contract, or (d) pursue judicial foreclosure as set forth in Section 9.

BY PLACING YOUR INITIALS BELOW THIS NOTICE YOU CERTIFY THAT YOU HAVE READ AND AGREE TO SECTION 15 IN ITS ENTIRETY.

Borrower's Initials: ___JDM___   Co-Borrower's Initials: ___IB___

**16.   ECOA NOTICE.** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, or age (providing that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal Agency that administers compliance with this law concerning this creditor is: The Federal Trade Commission, Consumer Response Center, Washington, DC 20580. Phone: 1-877-382-4357.

**17. BUYER'S RIGHT TO CANCEL. YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**18. STATE-SPECIFIC DISCLOSURES.**

**IN-HOME SALE CUSTOMERS: ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS:**

THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA, THE HOME SOLICITATION SALES ACT IN CONNECTICUT, AND THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA. THIS INSTRUMENT IS NOT NEGOTIABLE.

**ALABAMA BORROWERS:** ALABAMA RESIDENTS: CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE AND LOAN AGREEMENT BEFORE YOU SIGN OR ACKNOWLEDGE IT.

**ARIZONA BORROWERS:** This instrument is based upon a home solicitation sale, which is subject to the provisions of title 44, chapter 15.1. This instrument is not negotiable.

**NOTICE OF RIGHT TO FILE COMPLAINT:** The owner of the property subject to this contract has a right to file a written complaint with the Arizona Registrar of Contractors for an alleged violation of Ariz. Rev. Stat. § 32-1154(A) within two (2) years of completion of the specific project subject to this contract. The Arizona Registrar of Contractors may be reached through its website: https://roc.az.gov/; or by telephone: (602) 542-1525.

Notice: You may request that the initial disclosures prescribed in the truth in lending act (15 United States Code §§ 1601 through 1666j) be provided in Spanish before signing any loan documents.

Aviso: Usted puede solicitar que las divulgaciones iniciales prescritas en la Ley de veracidad en los préstamos (Código 15 de los Estados Unidos de América, artículos 1601-1666j) se provean en español antes de firmar cualquier documento del préstamo.

Note: There are additional disclosures for Arizona borrowers in a separate document.

DocuSign Envelope ID: 55A7EABE-356A-4CFB-8B20-8E81563C37D4

THIS IS A COPY

An authorized copy of this record is held at AVA3.docusign.net

COPY VIEW

**CALIFORNIA BORROWERS:** This loan is made pursuant to the California Finance Lenders Law, Cal. Fin. Code § 22000 et seq. FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION, STATE OF CALIFORNIA.

**CONNECTICUT BORROWERS:** THIS INSTRUMENT IS BASED UPON A HOME SOLICITATION SALE, WHICH SALE IS SUBJECT TO THE PROVISIONS OF THE HOME SOLICITATION SALES ACT. THIS INSTRUMENT IS NOT NEGOTIABLE

**DISTRICT OF COLUMBIA BORROWERS: Buyer's Right to Cancel –** If this agreement was solicited at or near your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and it must be mailed before midnight of the third business day after you signed this agreement. The notice must be mailed to GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

**FLORIDA BORROWERS:** This is a home solicitation sale, and if you do not want the goods or services, you may cancel this agreement by providing written notice to the seller in person, by telegram, or by mail. This notice must indicate that you do not want the goods or services and must be delivered or postmarked before midnight of the third business day after you sign this agreement. If you cancel this agreement, the seller may not keep all or part of any cash down payment.

**For Loan Agreements executed in Florida:** Florida documentary stamp tax required by law in the amount of $0.35 per hundred has been paid or will be paid by GoodLeap directly to the Department of Revenue. Certificate of Registration #78-8017862271-5.

**ILLINOIS BORROWERS:** Prepayment in full on any installment date under this agreement will reduce insurance charges for the loan.

**IOWA BORROWERS:** NOTICE TO CONSUMER:

[1] Do not sign this paper before you read it.
[2] You are entitled to a copy of this paper.
[3] You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law
IMPORTANT: READ BEFORE SIGNING. The terms of this agreement should be read carefully because only those terms in writing are enforceable. No other terms or oral promises not contained in this written contract may be legally enforced. You may change the terms of this agreement only by another written agreement.

**KANSAS BORROWERS:  NOTICE TO CONSUMER:**

(1) Do not sign this agreement before you read it.
(2) You are entitled to a copy of this agreement.
(3) You may prepay the unpaid balance at any time without penalty.

**LOUISIANA BORROWERS**:

CONSUMER'S RIGHT TO CANCEL: If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement. The notice must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661. If you cancel, the seller must return all of your cash down payment.

Notwithstanding any other provision in this agreement, you will not be obligated to pay us for our attorney's fees more than twenty-five percent of the unpaid debt after default and referral to an attorney for collect.

**MASSACHUSETTS BORROWERS:  You may cancel this agreement if it has been signed by a party thereto at a place other than an address of the seller, which may be his main office or branch thereof, provided you notify the seller in writing at his main office or branch by ordinary mail posted, by telegram sent or by delivery, not later than midnight of the third business day following the signing of this agreement.  See the attached notice of cancellation form for an explanation of this right.**

**MARYLAND BORROWERS:** This loan is made pursuant to the Credit Grantor Closed-end Credit Provisions of Title 12, Subtitle 10 of the Maryland Commercial Law Article (Md. Code Ann., Com. Law § 12-1001 et seq.).

Note: If you are a Maryland borrower who is 65 or older: **YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**MICHIGAN BORROWERS: Notice to buyer:**

**(1) Do not sign this contract before you read it.**
**(2) You are entitled to a completely filled-in copy of this contract.**
**(3) Under the law, you have the right to pay off in advance the full amount due and, under certain conditions, to obtain a partial refund of the finance charge.**
**(4) You may rescind or cancel this contract, not later than 5 p.m. on the business day following the date thereof by giving written notice of rescission to the contractor or his agent at his place of business given in the contract or by mailing the notice or cancellation to the contractor to his place of business given in the contract by depositing a properly addressed certified letter in a**

DocuSign Envelope ID: 55A7EAB5-356A-4CE9-8B20-8E81563C37D4

THIS IS A COPY

Unauthorized Copy of this records held at VA3.docusign.net

United States post office or mail box, but if you rescind after 5 p.m. on the business day following, you are still entitled to offer defenses in mitigation of damages and to pursue any rights of action or defenses that arise out of the transaction.

The seller is prohibited from having an independent courier service or other third party pick up your payment at your residence before the end of the 3-business-day period in which you can cancel the transaction.

**MISSOURI BORROWERS: NOTICE OF CANCELLATION**

If this agreement was solicited at your residence and you do not want the goods or services, you may cancel, without further obligation, this agreement by mailing a notice to the seller at the address as shown below, within 3 business days following the above date. You shall return the goods to seller in substantially the same condition as when you obtained them. Seller will then cancel all contracts and negotiable instruments executed by you and return any property given by you to seller within 10 days from date of transaction. If seller does not pick up the purchased goods within 20 days from date of your cancellation, you may retain or dispose of the goods without any further obligation.

The notice must be mailed to: GOODLEAP; 8781 Sierra College Blvd, Roseville, CA 95661

Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable.  To protect me and you (Lender) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

**NEBRASKA BORROWERS**: A credit agreement must be in writing to be enforceable under Nebraska law. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking, or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

**NEW HAMPSHIRE BORROWERS: You or your attorney may file a complaint with the New Hampshire Bank Commissioner.**

**NEW JERSEY BORROWERS:**

**RECEIPT:**  GOODLEAP - 8781 Sierra College Blvd., Roseville, CA 95661, Residential Solar/Storage System    Loan Down Payment: $0

**NOTICE TO RETAIL BUYER**: YOU MAY RESCIND THIS SALE PROVIDED THAT YOU NOTIFY THE RETAIL SELLER OF YOUR INTENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTMARKED NOT LATER THAN 5 P.M. OF THE THIRD BUSINESS DAY FOLLOWING THE SALE. FAILURE TO EXERCISE THIS OPTION, HOWEVER, WILL NOT INTERFERE WITH ANY OTHER REMEDIES AGAINST THE RETAIL SELLER YOU MAY POSSESS. IF YOU WISH, YOU MAY USE THIS PAGE AS NOTIFICATION BY WRITING 'I HEREBY RESCIND' AND ADDING YOUR NAME AND ADDRESS. A DUPLICATE OF THIS RECEIPT IS PROVIDED BY THE RETAIL SELLER FOR YOUR RECORDS.

The section headings of this Note are a table of contents and not contract terms.  Portions of this Note with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires.  In this Note, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

**NORTH DAKOTA BORROWERS:** This instrument is based upon a personal solicitation sale, which is subject to the provisions of the North Dakota Century Code. This instrument is not negotiable.

**OHIO BORROWERS: This loan is made pursuant to the provisions of Ohio Rev. Code Ann. §§ 1321.62-1321.702.**

**OKLAHOMA BORROWERS**: You should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties.

BUYER'S RIGHT TO CANCEL If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement.

The notice must be mailed to: GOODLEAP; 8781 Sierra College Blvd., Roseville, CA 95661.

If you cancel, the seller may keep all or part of your cash down payment not to exceed five percent (5%) of the cash price.

**RHODE ISLAND BORROWERS: NOTICE OF CANCELLATION –** You may cancel this transaction, without any penalty or obligation, within three (3) business days from the above date. If you cancel, your cancellation notice must state that you do not wish to be bound by the agreement and mailed by registered or certified mail not later than midnight three (3) days following the buyer's signing the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made. All cancellations must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

**SOUTH CAROLINA AND IDAHO BORROWERS:  BUYER'S RIGHT TO CANCEL –** If you decide you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement.

The notice must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

DocuSign Envelope ID: 55A7EABE-356A-4CEB-8B20-8E81563C37D4

THIS IS A COPY
The Authoritative Copy of this record is held at apps.docusign.net

**SOUTH DAKOTA BORROWERS:** Any improprieties in making the loan or in loan practices may be referred to the South Dakota Division of Banking at: 1601 N. Harrison Avenue, Suite 1, Pierre, SD 57501, Phone: 605.773.3421.

**UTAH BORROWERS: BUYER'S RIGHT TO CANCEL** – If this agreement was solicited at your residence or place of employment and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight on the third business day after you sign this agreement. The notice must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

The written agreement is a final expression of the agreement between the creditor and debtor and the written agreement may not be contradicted by evidence of any alleged oral agreement.

**VIRGINIA BORROWERS:** **BUYER'S RIGHT TO CANCEL – If this agreement was solicited at a residence and you do not want the goods or services, you, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.**

**WISCONSIN RESIDENTS:** For married Wisconsin residents, my signature on this Promissory Note confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

**RHODE ISLAND BORROWERS: NOTICE TO BUYER**

(1) **Do not sign this agreement if any of the spaces intended for the agreed terms of the extent of then available information are left blank.**

(2) **You are entitled to a copy of this agreement at the time you sign it.**

(3) **You may at any time pay off the full unpaid balance due under this agreement, and in so doing you may be entitled to receive a partial rebate of the finance and insurance charges.**

(4) **The seller has no right to enter unlawfully your premises or commit any breach of the peace to repossess goods purchased under this agreement.**

(5) **You may cancel this agreement if it has not been signed at the main office or a branch office of the seller, provided you notify the seller at his main office or branch office shown in the agreement by registered or certified mail, which shall be posted not later than midnight of the third calendar day after the day on which the buyer signs the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made. See the attached notice of cancellation form for an explanation of buyer's rights.**

By signing below I/we confirm that I/we have read and agree to the terms in the Loan Agreement:

Borrower's Signature: Jose david Murillo                                      Date: Sep 1, 2022

Co-Borrower's Signature: Irma Barrios                                          Date: Sep 1, 2022

GoodLeap, LLC: *Matt Dawson*

**Matt Dawson, Co-Founder**

THIS IS A COPY
The Authoritative Copy of this record is held at na3.docusign.net

**EXHIBIT A: EXAMPLE OF LOAN CLOSING CERTIFICATE**

## Loan Closing Certificate

Borrower**:**                                                    **Residence Address:**
Co-Borrower:
Email:
Phone:
Loan Agreement Number:

| LOAN SUMMARY | | | | |
|---|---|---|---|---|
| LOAN START DATE | FIRST PAYMENT DATE | RECURRING PAYMENT DAY | MATURITY DATE | TOTAL LOAN AMOUNT |

| SUMMARY OF LOAN TERMS AND PAYMENTS | | | | | | |
|---|---|---|---|---|---|---|
| LOAN TERM | TOTAL LOAN AMOUNT | INITIAL MONTHLY PAYMENT | INTEREST RATE / APR | TARGET BALANCE | TARGET BALANCE DATE | ADJUSTED MONTHLY PAYMENT* |

*Adjusted monthly payment assumes that no prepayment was made and the Target Balance was not met by the Target Balance Date, and you do not change the Autopay payment election.

Your interest rate/APR and monthly payments may vary depending upon whether you cancel or add Autopay payments during the term of the loan.

**SOLAR/STORAGE SYSTEM DESCRIPTION**

Installation Contractor:                              *Home Improvement Agreement Number:

*Purchased Goods under this Loan Agreement will be detailed in your Home Improvement Agreement

**PAYMENT TERMS**

Term:                                                              Target Balance Date:
Interest Rate / APR:                                     Target Balance Amount:
Initial Monthly Payment:                             Adjusted Monthly Payment:

**LOAN SUMMARY**

Loan Start Date:                                            Maturity Date:
First Payment Date:                                      Total Loan Amount:
Recurring Payment Day:

DocuSign Envelope ID: 55A7EABE-356A-4CE0-8B20-8E81563C37D4

THIS IS A COPY

The Authoritative Copy of this record is held at na3.docusign.net



**Credit Score Disclosure**

H-4. Model form for credit score disclosure exception for loans not secured by residential real property

**GoodLeap**

**Your Credit Score and the Price You Pay for Credit**

## Your Credit Score

| Your credit score | **843** | | |
|---|---|---|---|
| | Source: **equifax** | Date: | **Sep 01, 2022** |

## Understanding Your Credit Score

| What you should know about credit scores | Your credit score is a number that reflects the information in your credit report. |
|---|---|
| | Your credit report is a record of your credit history. It includes information about whether you pay your bills on time and how much you owe to creditors. |
| | Your credit score can change, depending on how your credit history changes. |
| How we use your credit score | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| The range of scores | Scores can range from a low of **300** to a high of **850**. |
| | Generally, the higher your score, the more likely you are to be offered better credit terms. |
| How your score compares to the scores of other consumers | Your credit score ranks higher than **96** percent of U.S. consumers. |

DocuSign Envelope ID: 55A7EABE-356A-4CE9-8B20-8E81563C37D4

THIS IS A COPY
The Authoritative Copy of this record is held at na3.docusign.net



**Credit Score Disclosure**

## Checking Your Credit Report

| | |
|---|---|
| What if there are mistakes in your credit report? | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency. |
| | It is a good idea to check your credit report to make sure the information it contains is accurate. |
| How can you obtain a copy of your credit report? | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year. |
| | To order your free annual credit report – |
| | *By telephone:*  Call toll-free:  1-877-322-8228 |
| | *On the web:*  Visit www.annualcreditreport.com |
| | *By mail:*  Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's web site at http://www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to: |
| | Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| How can you get more information? | For more information about credit reports and your rights under federal law, visit the Consumer Financial Protection Bureau's website at www.consumerfinance.gov/learnmore. |

COPY VIEW

DocuSign Envelope ID: 55A7EABE-356A-4CEB-8B20-8E81563C37D4

THIS IS A COPY

The Authoritative Copy of this record is held at app.da3.docusign.net

**FOR ALL BORROWERS:**                                                                      Sep 1, 2022

**NOTICE OF RIGHT TO CANCEL**

**YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.**

**IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENT MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE  CANCELLED.**

**IF YOU CANCEL YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.**

**IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.**

**TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO GOODLEAP, AT 8781 SIERRA COLLEGE BLVD., ROSEVILLE, CA 95746 NOT LATER THAN MIDNIGHT OF    9/6/2022    (Month/Day/Year).**

**I HEREBY CANCEL THIS TRANSACTION.**


_____                    _____
**Date**                                      **Borrower**

THIS IS A COPY
The Authoritative Copy of this record is held at apps3.docusign.net

**FOR ALL BORROWERS:**                                                                     Sep 1, 2022

## NOTICE OF RIGHT TO CANCEL

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENT MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE  CANCELLED.

IF YOU CANCEL YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO GOODLEAP, AT 8781 SIERRA COLLEGE BLVD., ROSEVILLE, CA 95746 NOT LATER THAN MIDNIGHT OF ____9/6/2022____ (Month/Day/Year).

I HEREBY CANCEL THIS TRANSACTION.


_____                    _____
**Date**                               **Borrower**

DocuSign Envelope ID: 55A7EABF-856A-4CFB-8B20-8E81563C37D4

THIS IS A COPY
The Authorized Copy of this record is held by GVA3.docusign.net

COPY VIEW

## PRIVACY POLICY AND INFORMATION SHARING NOTICE

**Privacy Policy:**  We take our responsibility to protect the privacy and confidentiality of customer information seriously.  We maintain safeguards that comply with federal standards to secure and protect your information.  This policy applies to consumers who are current or former customers of GoodLeap, LLC ("GoodLeap").  We gather information from your application, when you make a payment, consumer credit reporting agencies, public sources, and other data sources.  We may only disclose this data as permitted by law.  We may provide your information without your consent to regulatory or law enforcement agencies as permitted by law.
**Information Sharing and Opt-Out:**  Financial companies choose how they share your personal information.  Federal law gives you the right to limit some, but not all sharing.  Federal law also requires us to tell you how we collect, share, and protect your personal information.  Please read this notice carefully to understand what we do.  For additional information visit: http://www.goodleap.com/privacy.html.

The types of personal information we collect and share include, but aren't limited to:

| | | |
|---|---|---|
| -    Account Balances and Payment History | Social Security Number and Income | -    Address |
| -    Bank Account Information | Credit History and Scores | -    Phone Numbers |

All financial companies need to share customers' personal information to conduct their everyday business.  In the section below, we list the reasons companies can share their customers' information; the reason we share this information; and whether you can limit this sharing. If you have any questions please call (877) 290-9991.

| Reasons we share your information | Do we share this information? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes such as to process your transactions, maintain your account, respond to court orders and legal investigations, or report to the credit bureaus | YES | NO |
| For our own marketing purposes to offer products and services to you | YES | NO |
| For joint marketing with other financial companies – to offer other services to you | YES | NO |
| For our affiliates everyday business purposes – information about your transactions and experiences | NO | NA |
| For our affiliates everyday business purposes – information about your creditworthiness | NO | NA |
| For our affiliates to market to you | NO | NA |
| For non-affiliates to market to you | NO | NA |

| | |
|---|---|
| **How does GoodLeap protect my personal information?** | To protect your information from unauthorized access and use, we use security measures that comply with federal law.  These include computer safeguards and secured files and buildings. |
| **How does GoodLeap collect my personal information?** | When you apply for a loan or make a payment.  We also collect information from other data providers such as credit bureaus. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only:<br> -  Sharing for affiliates' business purposes – info about your creditworthiness<br> -  Affiliates from using your information to market to you<br> -  Sharing with non- affiliates to market to you |
| **Affiliates** | Companies related by common ownership |
| **Non-Affiliates** | Companies not related by ownership or control.  Non-affiliates we can share with include other financial services companies or non-financial services companies. |
| **Joint Marketing** | A formal agreement between non-affiliated companies to market to you. |

For CA and VT residents only:  Under California and Vermont law we will not share information we collect about you with companies outside of GoodLeap unless the law allows.

## EXPRESS WRITTEN CONSENT TO COMMUNICATE OR CALL VIA CELL PHONE OR OTHER MEANS

We take your privacy seriously.  By signing this document, you are providing express written consent for GoodLeap, LLC ("GoodLeap") or companies working on our behalf to call you (including through automated means: e.g. autodialing, text, and pre-recorded messaging) via telephone, mobile device or cell phone (including SMS and MMS) and/or via email, even if your telephone number is currently listed on any state, federal, or national Do-Not-Call (DNC) list.

Consent is not required to conduct business with GoodLeap and this consent can be withdrawn at any time by calling (877) 290-9991 or requesting by mail at GoodLeap: 8781 Sierra College Blvd, Roseville, CA 95661. If you withdraw your consent you will be put on GoodLeap's internal Do-Not-Call list.

For NV residents only:  We are providing this notice under state law.  You may be placed on our internal Do-Not-Call list by calling (877) 290-9991.  Nevada asks us to provide their contact information.  Office Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St. Suite 3900, Las Vegas, NV 89101.  Phone: (702) 486-3132; Email: bcpinfo@ag.state.nv.us.

**Borrower's Signature:** _Jose david Murillo_____      **Date:** _Sep 1, 2022_

DocuSigned by:
4D3F02649627C40...

**Co-Borrower's Signature:** _Irma Barrios_____      **Date:** _Sep 1, 2022_

4D3F026496274C0...

THIS IS A COPY
The Authoritative Copy of this record is held at apps3.docusign.net

**OPTIONAL OPT OUT OF CREDIT BUREAUS FROM SHARING PERSONAL INFORMATION FOR PRESCREENED OFFERS**

I understand that I have the ability to opt out of credit bureaus providing my personal information to third parties, including other lenders for prescreened offers, when my credit is pulled.  Below, I select whether I would like GoodLeap to opt out from prescreened offers on my behalf.  Whether or not I choose opt out **WILL NOT HAVE ANY IMPACT ON MY CREDIT APPLICATION WITH GOODLEAP**.  This voluntary opt out will be effective for five (5) years from the date of this election.  At any time, I/we may opt-in to again receive prescreened offers of credit or insurance at the website: www.optoutprescreen.com.

[  ]  I/we AUTHORIZE GoodLeap to utilize my/our information to opt-out from credit bureaus from providing my personal information to third parties for prescreened firm offers of credit or insurance on my/our behalf through the website: www.optoutprescreen.com upon loan funding.

[X]  I/we DO NOT AUTHORIZE GoodLeap to utilize my/our information to opt-out from credit bureaus from providing my personal information to third parties for prescreened firm offers of credit or insurance on my/our behalf through the website: www.optoutprescreen.com upon loan funding.

Borrower's Signature: _Jose david Murillo_____     Date: _Sep 1, 2022_

Co-Borrower's Signature: _Irma Barrios_____     Date: _Sep 1, 2022_

DocuSign Envelope ID: 55A7FABF-3E5A-465D-8B20-8E81563C37D4

THIS IS A COPY
of an unauthorized copy of this recorded note at http://www.docusign.net

## MEMBERSHIP APPLICATION AND AGREEMENTS

GoodLeap partners with various financial institutions and credit unions who may purchase loans originated by GoodLeap. When a credit union purchases your loan you may be enrolled as a member of that credit union and will receive the added benefits of that membership. Your membership may be cancelled any time after enrollment at your request.

By initialing below, I understand that I am applying for a PenFed Credit Union Membership, I have read and reviewed the following disclosures.
https://www.penfed.org/forms/penfed-membership-disclosures
https://www.penfed.org/privacy-policy
https://www.penfed.org/current-service-fees
https://www.penfed.org/accounts/regular-savings-account

Borrower's Initials: **JDM**

## PENFED MEMBERSHIP AGREEMENT

The words "I", "me", "my", "myself" mean each person signing the Membership Application/Signature Card including anyone who has access to the account(s).

1.      I understand this account shall be governed by the Code of Virginia, federal laws, National Credit Union Administration (NCUA) Rules and Regulations, and the bylaws and policies and procedures of the credit union and amendments thereto. This account shall be subject to other terms and conditions which are subject to change upon notice to me.

2.      I agree PenFed has the right pursuant to its statutory lien, and I give my express consent to enable PenFed to charge against a balance in my PenFed accounts, including accounts on which I am a joint owner, to include otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate PenFed indebtedness owed by me or a person who is listed as a joint owner on my accounts with PenFed, including a deceased joint owner. This provision does not include my IRA account or other accounts for which this provision is not permitted under Internal Revenue Code. PenFed may take such action without further notice to me or a joint owner. In regard to those funds having a statutory protection, I understand I may withdraw my express consent for PenFed to apply such funds to pay such indebtedness by notifying PenFed in writing. If my consent is withdrawn, PenFed may, in its sole discretion, terminate services I have with the credit union.

3.      I expressly authorize PenFed to procure upon its request from a person, partnership, credit reporting agency, association, firm, or corporation a credit report, and for such person to furnish PenFed with said credit report concerning financial services I may request or obtain from PenFed as well as subsequent re-evaluation of such financial services.

4.      If I have caused PenFed to incur a loss due to my activities, or if accounts at PenFed are maintained by me in a manner PenFed, in its sole discretion, deems contrary to sound financial practice, I agree PenFed may terminate all accounts or services which I may receive from PenFed with the exception of my Regular Share Account.

5.      I understand if all my shares in PenFed are withdrawn, my membership in PenFed may be terminated. Funds in my accounts will be subject to collection through normal banking channels and PenFed's hold policy.

6.      I agree my share accounts are not transferable except on the records of PenFed.

7.      I agree payment of money in the account on the written instructions of an authorized person excuses PenFed of further legal obligation regarding the proceeds of the transaction. I agree to indemnify and hold PenFed harmless from suits or liability, directly or indirectly, resulting from the handling of the account consistent with the written instructions of an authorized person. PenFed may refuse to honor my instruction if it is unclear or the signature appears not to be authentic.

8.      Financial services provided by PenFed may be used for any transaction permitted by law. I agree illegal use of financial services will be deemed an action of default and/or breach of contract and such service and/or other related services may be terminated in PenFed's discretion. I further agree, should illegal use occur, to waive rights to sue PenFed for such illegal use or activity directly or indirectly related to it. I agree to indemnify and hold PenFed harmless from suits or other legal action or liability, directly or indirectly, resulting from such illegal use.

**9.      JOINT SHARE ACCOUNT AGREEMENT:**
If my accounts, either now or in the future, are established as a joint account, PenFed is authorized to recognize all of the joint owner signatures for the payment of funds or for transactions for this account. The joint owners of this account agree with each other and with PenFed that all funds deposited into the account shall be owned jointly by all joint owners. The funds on deposit will be subject to the withdrawal or receipt of all joint owners. In the event of death of an owner and according to the type of joint share account selected, withdrawal or payment may also be made to the survivor(s) or the estate(s) of the deceased owners(s). Each joint owner will discharge PenFed from liability for the payment or withdrawal. A joint owner who is a PenFed member may pledge all or part of the shares in this account as collateral security for a loan or loans, and PenFed is authorized to charge against this account indebtedness owing to it by each of the joint owners.

**Please note: Joint ownership does not constitute membership.**

This account shall be governed by the Code of Virginia, federal laws, rules and regulations, and the bylaws of PenFed and amendments thereto.

PenFed is federally insured by the National Credit Union Administration (NCUA). The information in this form is current as of May 2019 and is subject to change. To determine if changes have occurred since printing, call 800-247-5626. Our address, in accordance with NY Law, is 7940 Jones Branch Drive, Tysons, VA 22102.

I/we have read the attached Membership and Joint Account Agreement and, if accepted, I/we agree to comply with these terms and any amendments thereto, and to subscribe to at least one share. I/we authorize PenFed to obtain a credit report to determine my/our eligibility for this account or other financial services, I/we may request. Under penalties of perjury, I/we certify: 1) the number shown on the form is my/our correct taxpayer identification number; and 2) I/we am/are not subject to backup withholding because (a) I/we am/are exempt from backup withholding, or (b) I/we have not been notified by the Internal Revenue Service (IRS) that I/we am/are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me/us I/we am/are no longer subject to backup withholding (cross out this section if you are subject to withholding); and 3) I/we are a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

**PenFed Credit Union may purchase loans originated by GoodLeap. By reading and signing this document, I/we agree to the terms of this agreement and to become a member of PenFed if my/our loan is purchased by PenFed. If you sign this form and PenFed does not purchase your loan you will not become a member of PenFed.**

Borrower's Signature: **Jose david Murillo**        Date: Sep 1, 2022

## MONTHLY PAYMENT AUTHORIZATION DOCUMENT

GoodLeap is providing this document to you to complete your loan payment method.

[ x ] **Payment by Autopay**: GoodLeap offers Autopay as a service to our clients. *By paying with Autopay, you authorize GoodLeap and its agents, service providers, and successors or assignees to initiate preauthorized electronic fund transfers ("Autopay") on or after the Recurring Payment Day specified in the Loan Closing Certificate from your account described below or from any updated bank account that you subsequently supply to us* (the "Account"). If the Autopay is not made on the Recurring Payment Day for whatever reason, GoodLeap will deduct the payment on the next day that GoodLeap processes such payments, or as soon thereafter as practicable. The Autopay amount will be equal to the Initial Monthly Payment and then the Adjusted Monthly Payment as shown in your Loan Agreement (or any modified amounts we may later agree to) and will continue until your loan is paid in full or you cancel this authorization. If the amount of your payment changes from this amount, we will provide notice at least ten (10) days before the scheduled date of the payment. You certify that you are the owner or joint owner of the Account. We are not responsible for bank charges you may incur due to dishonored Autopay. We may reinitiate any Autopay from the Account that is unsuccessful up to two times, until it is successful. You further authorize us to correct any erroneous transactions with credits or debits to your Account, if necessary.

**Information for Autopay:**

| Bank/Credit Union Name | |
|---|---|
| 1111 | |
| Routing / ABA Number | Bank Account Number |
| 111111111 | 1111 |



Please know that you may terminate this authorization at any time by either (1) paying the remaining balance due, (2) sending written notice to us at **8781 Sierra College Blvd, Roseville, CA 95661**, or (3) calling 1-800-345-9372. It may take three business days for the change to take effect.  Cancelling Autopay does not terminate or relieve you of making all your payments on time each month. In addition, cancelling Autopay removes the Autopay discount which will increase your interest rate/APR by 0.50% which will result in a higher monthly payment.

[  ] **Payment by Alternative Method**: If this box is checked, you elect NOT to make your scheduled monthly payments by Autopay.  Instead each month, you must mail a check to us or arrange for payments to be made in some other manner acceptable to GoodLeap.  **There may be additional payment processing fees when electing alternative payment methods, such as debit card payment charges, where allowed by law.** Also, by choosing this option you understand that the interest rate/APR and monthly payment will not include the 0.50% discount if you had selected to pay by Autopay.

PLEASE KEEP A COPY OF THIS DOCUMENT FOR YOUR RECORDS.

Borrower's Signature: Jose david Murillo                                      Date: Sep 1, 2022

DocuSign Envelope ID: 55A7FA9E-3E5A-465D-9B20-8E81563C37D4

THIS IS A COPY
the authoritative copy of this record is held at NA3.docusign.net



**EXHIBIT B**

DocuSign Envelope ID: 8A742FB1-98B9-41EC-A98B-12FDB1384C4E

THIS IS A COPY
This is an authorized copy of this record from mylife at 163.docusign.net

# go⌀dleap

Our mission is to connect a world in which
**everyone can live sustainably.**

Inside this package is your payment agreement
for your upcoming home improvements.

Thank you for choosing us, and one of our trusted
partners, to help you upgrade your home.

3ba07a59-01a0-4892-b1ec-84f63e031cd8

# go⌀d
for life, earth, and prosperity

DocuSign Envelope ID: 8A742FB1-98B9-41FC-A98B-13FDB1384C4E
THIS IS A COPY
Unauthorized copy of this recorded document at na3.docusign.net

# goodleap™

Key Loan Terms

In this package, you will be signing your loan agreement with the following terms:

| Loan Amount | Loan Term | Interest Rate/APR |
|---|---|---|
| **$49,968.00** | **25 years** | **2.99%** |

| JDM | MIMB |
|---|---|
| Borrower's Initials | Co-Borrower's Initials |

| Initial Payment | Your initial GoodLeap monthly payment for the first 18 months. |
|---|---|
| **$170.42 (e) / month** | |

| Adjusted Monthly Payment | Your adjusted GoodLeap monthly payment starting in month 19 until the end of your loan term if no voluntary payments are made in the first 18 months. |
|---|---|
| **$244.48 (e) / month** | Your loan is designed to re-amortize at the end of the 18th month. If you choose to make voluntary prepayments on your loan equal to 30% of your loan amount before the end of the 18th month, your loan payment will stay approximately the same as your initial monthly payment throughout the life of your loan. If you do not make a voluntary prepayment, your monthly loan payment will go up to the adjusted amount. |

"(e)" means "Estimate"

Your loan start date is the date we fund the loan to your Contractor. Interest on your loan begins to accrue on the loan start date.

Your first payment date will be due approximately 90 days after your loan start date. Your first payment date may be before your system has been granted Permission to Operate from your utility company.

Borrower's signature: _Jose david Murillo_   Date: _Sep 1, 2022_

Co-Borrower's signature: _Marina isamar Murillo berrios_   Date: _Sep 1, 2022_

If you have any questions about your loan or your loan terms after reviewing this package, please call GoodLeap at 1 (844) 910-0111.

DocuSign Envelope ID: 8A742FB1-88B9-41BC-A98B-12FDB1284C4E

THIS IS A COPY
The Authoritative Copy of this record is held at na3.docusign.net



Notice to Cosigner

If you do not own the home where this installation is to occur and you are not married to someone who does, you are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The creditor can collect this debt from you without first trying to collect from the borrower. The creditor can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.



DocuSign Envelope ID: 8A742FB1-08B9-415C-A98B-13FDB1384C4E

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**GOODLEAP**

8781 Sierra College Blvd, Roseville, CA 95661   Phone: 1-877-290-9991

### Truth in Lending Disclosure Statement

| | |
|---|---|
| **Borrower:** Jose david Murillo | **Residence Address:** |
| **Co-Borrower:** Marina isamar Murillo berrios | ▉ |
| **Email:** ▉ | RESEDA, CA 91335-▉ |
| **Phone:** (818)▉ | |
| **Loan Agreement Number:** ▉3863 | **Date of the Agreement:** Sep 1, 2022 |

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| **2.99%** | **$21,701.73 (e)** | **$49,968.00** | **$71,669.73 (e)** |

**Monthly Payment Schedule**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 1 | $170.42 (e) | Monthly, beginning 3 months after the Loan Start Date **(e)** |
| 15 | $170.42 (e) | Monthly, beginning 4 months after the Loan Start Date **(e)** |
| 281 | $244.48 (e) | Monthly, beginning 19 months after the Loan Start Date **(e)** |
| 1 | $244.13 (e) | **300 months after the Loan Start Date (e)** |

"(e)" means an estimate

| | |
|---|---|
| **Autopay – Variable Rate:** | The Annual Percentage Rate (APR) and Monthly Payment Schedule above are based, in part, on the Autopay payment option you selected in the loan application.  You may change your Autopay payment option at any time.  Selecting Autopay payments provides a 0.50% interest rate/APR discount and a lower monthly payment.  Cancelling Autopay payments will raise your interest rate/APR by 0.50% and will result in a higher monthly payment. |
| **Security:** | You are giving a security interest in the personal property you are purchasing in this transaction and your rights under any related agreement. |
| **Prepayment:** | If you pay off your loan early, you will not have to pay a penalty. |
| **Contract Reference:** | See your Loan Agreement ("Agreement") for any additional information about nonpayment, default, and any required repayment in full before the scheduled date. |

**Itemization of Amount Financed**

| | |
|---|---|
| Itemization of the amount financed: | $49,968.00 |
| Amount given to you directly: | $0 |
| Amount paid to others on your behalf: | $49,968.00 to Pacific Energy Network, LLC |

The "Loan Start Date" is the date we send funds to your contractor.  This date must be within 180 days of the initial application date.

This loan is assumable upon the sale of the property to a new owner, if the new home owner qualifies under GoodLeap's underwriting guidelines.

The Payment Schedule shown above assumes that you make no voluntary prepayments on your Loan.  However, we have designed the Loan so that it will re-amortize at the end of the 18th month after your Loan Start Date.  As a result, if you make all scheduled payments on time and also make sufficient voluntary prepayment(s) to reduce your total loan amount to the "Target Balance" by the "Target Balance Date" described in your Agreement, your payments from month 19 through the end of your term will be approximately equal to your initial monthly payment stated above.

Your Contractor may have opted to pay GoodLeap a fee in order for GoodLeap to offer you credit on the terms in this Agreement.  Your purchase price set by the Contractor may include your Contractor's various costs, including this fee.

The Payment Schedule shown above assumes you make no changes to your Autopay payment option. For example, your 25 year loan of $49,968.00 with Autopay payments will have an interest rate/APR of 2.99% and an initial monthly payment of $170.42 (e)

THIS IS A COPY

Unauthorized copy of this record is held at NAS.docusign.net

per month. Your 25 year loan of $49,968.00 without Autopay payments will have an interest rate/APR of 3.49% and an initial monthly payment of $180.54 (e) per month.

**By signing below, you acknowledge that you have read and received a complete copy of this disclosure to keep for future reference before you signed your Agreement.**



**Borrower's Signature:** Jose david Murillo                                    **Date:** Sep 1, 2022

**Co-Borrower's Signature:** Marina isamar Murillo berrios                **Date:** Sep 1, 2022

**GoodLeap, LLC:**

**Matt Dawson, Co-Founder**

DocuSign Envelope ID: 8A742FB1-08B9-415C-A98B-13FDB1384C4E

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**GOODLEAP**
8781 Sierra College Blvd, Roseville, CA 95661   Phone: 1-877-290-9991

## Loan Agreement

**Borrower:** Jose david Murillo
**Co-Borrower:** Marina isamar Murillo berrios
**Email:** ▮▮▮▮
**Phone:** (818) ▮▮▮▮▮
**Loan Agreement Number:** ▮▮▮3863

**Residence Address:**
▮▮▮▮▮
RESEDA, CA 91335-▮▮

**Date of the Agreement:** Sep 1, 2022

This document provides a Summary of the terms and conditions of your Loan.

### SUMMARY OF LOAN TERMS AND PAYMENTS

| 25 YEARS | $49,968.00 | $170.42 (e) | 2.99% | $34,490.45 (e) | May 01, 2024 (e) | $244.48 (e) |
|---|---|---|---|---|---|---|
| LOAN TERM | TOTAL LOAN AMOUNT | INITIAL MONTHLY PAYMENT | INTEREST RATE / APR | TARGET BALANCE | TARGET BALANCE DATE | ADJUSTED MONTHLY PAYMENT* |

(e) means estimate
* Adjusted monthly payment assumes that no prepayment was made and the Target Balance was not met by the Target Balance Date, and you do not change the Autopay payment election.

### SYSTEM INFORMATION

Installation Contractor: Pacific Energy Network, LLC

Purchased Goods under this Loan Agreement will be detailed in your Home Improvement Agreement with your Contractor. By initialing below, you confirm receipt of such Home Improvement Agreement.
**Borrower's Initials:** _JDM_   **Co-Borrower's Initials:** _MIMB_

### LOAN INFORMATION

**Loan Start Date and First Payment Date**
The "Loan Start Date" and "First Payment Date" will be finalized in your Loan Closing Certificate (Exhibit A), an example of which is fully incorporated herein. This certificate will be sent to you following disbursement of the loan proceeds.

**The "Loan Start Date" will be the date that we disburse loan proceeds to your Contractor.**

**The "First Payment Date" will be set by us as follows: If the Loan Start Date is on the 1st through 28th, it will be on the corresponding date 3 months later (i.e., if June 15th, then September 15th); if the Loan Start Date is on the 29th through 31st, it will be on the first day of the first month following 90 days after the Loan Start Date (i.e., if June 30th, then October 1st). You are obligated to make all loan payments starting on your First Payment Date, regardless of the utility company granting permission to operate.**
**Borrower's Initials:** _JDM_   **Co-Borrower's Initials:** _MIMB_

Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the first calendar day following the Loan Start Date. Thus, the longer your First Payment Date is from the Loan Start Date, the more interest you will pay. If you wish to reduce the amount of interest that accrues, you can begin making payments earlier, at any time you choose after the Loan Start Date. However, interest will continue to accrue until all amounts owed under this Agreement are paid in full.

Your loan application was approved for a period of 180 days from the initial credit report date. If the Loan Start Date does not occur within 180 days from the initial credit report date, we will request a new credit report from the credit bureaus, to make sure that you continue to qualify for the same loan terms. This may impact your credit score.

**Tax Credit**
You may be eligible for a federal solar investment tax credit. You acknowledge that eligibility for this tax credit is not guaranteed. In order to realize the benefits of the solar investment tax credit, you must have federal income liability that is at least equal to the value of the credit. We are not financially responsible for your receipt of any tax credits related to the Solar Equipment. We do not provide tax advice and nothing in this Loan Agreement is intended to be used as tax advice. To determine your eligibility for any federal solar investment tax credit, you should make an independent assessment or consult with your tax advisor.

**Target Balance Payments and Initial Monthly Payments**
You are not required to make prepayments. However, you acknowledge that in order to avoid an increase in your Initial Monthly Payment, you must make one or more voluntary prepayments equal to 30% of your Total Loan Amount by your Target Balance Date. If you pay more than 30% of your Total Loan Amount, your monthly payments will be adjusted to a lower amount than the Initial Monthly Payment. If you do not make any prepayments, or if your prepayments are less than 30% of your Total Loan Amount, your monthly payments will be adjusted to a higher amount than the Initial Monthly Payment. You also understand that your Initial Monthly Payments will not be fully amortizing, but your new Monthly Payment after the Target Balance Date will be fully amortizing.
**Borrower's Initials:** _JDM_   **Co-Borrower's Initials:** _MIMB_

**Security Agreement**
You authorize us to file on your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and/or a county fixture filing required to perfect our security interest in the Collateral to the extent required by applicable law, as outlined in Section 6 of this Agreement.

**FOR MASSACHUSETTS BORROWERS ONLY: You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.**

### LOAN AGREEMENT

THIS IS A COPY
An authorized copy of this record is held at A3.docusign.net

THIS AGREEMENT IS LEGALLY BINDING AS OF AND FOLLOWING THE DATE OF THIS AGREEMENT. IN THIS AGREEMENT, THE WORDS "YOU" AND "YOUR" REFER TO BORROWER, CO-BORROWER AND BORROWER'S AND/OR CO-BORROWER'S PERMITTED ASSIGNEES, AND THE WORDS "LENDER," "WE," "US" AND "OUR" REFER TO GOODLEAP OR ITS ASSIGNEES.  THIS AGREEMENT SUPERSEDES ANY PRIOR AGREEMENT BETWEEN YOU AND US CONCERNING THE SAME SUBJECT MATTER.

**1.   INTRODUCTION.**  The parties (each, a "Party" and collectively, "Parties") to this Agreement are you and GoodLeap, LLC ("GoodLeap"). Your solar installation contractor ("Contractor") has provided us with a copy of a signed home improvement agreement between you and the Contractor (the "Home Improvement Agreement") under which the Contractor will install solar panels, inverters, racking systems, wiring, electrical and mechanical connections, metering, monitoring and/or other distributed generation interconnect equipment ("Solar Equipment") and may, in addition or instead, install new roofs and related roofing materials, battery storage equipment, electrical vehicle power charging equipment, and thermostat equipment, and provide landscaping services to accommodate the solar system (together with the Solar Equipment, "Purchased Goods") at your home ("Residence") located at the Residence Address listed above.

**2.   PROMISE TO PAY.**  For value received, you promise to pay to GoodLeap and/or its assignees, the principal sum of the Total Loan Amount, with interest as set forth in Section 3 ("Interest and Payments") and any fees assessed in Section 4 ("Fees") below.

**3.   INTEREST AND PAYMENTS.**

a.   Payment Timing.  Your first Monthly Payment is due and payable on the First Payment Date (estimated on the Truth in Lending Disclosure and finalized on the Loan Closing Certificate).

b.   Payment Application.  If you make a payment that satisfies all current and past due installments, any additional payment will be allocated as set forth in the following sentence, but that additional payment will not change the due date for any payment that comes due in the future. To the extent permitted by applicable law, all payments or prepayments will be applied first to accrued interest, then to unpaid principal in the inverse order of maturity (last to first), and then to fees or costs payable to us under this Agreement.

c.   Accrual.  Interest will accrue on the loan amounts actually disbursed, with the first accrual starting on the first calendar day following the Loan Start Date. Interest will continue to accrue until all amounts owed under this Agreement are paid in full.  Unpaid interest will not be added to the principal balance.  To the extent permitted by applicable law, interest on your loan will be calculated on a 30/360 basis. For any partial month, interest accrues based on the actual number of days your loan is outstanding for such partial month.  If you make your loan payments late, more interest will accrue, and the total finance charge you pay over the life of your loan will be higher. If you make your loan payments early, less interest will accrue, and the total finance charge you pay over the life of your loan will be less. Interest accrues between the Loan Start Date and your First Payment Date, and the longer the period of time between the Loan Start Date and your First Payment Date, the more interest will accrue.  If you wish to reduce the amount of interest that accrues before your First Payment Date, you can begin making loan payments any time after the Loan Start Date. The amount of your final loan payment will change based on when you pay your monthly loan payments and whether you make any voluntary prepayments.

d.   Interest rate and Monthly Payment Amounts.  Your interest rate may vary depending upon only whether you cancel or add Autopay payments during the term of your loan, with a 0.50% interest rate discount for Autopay, or removal of that discount without Autopay. The monthly payments you must make, assuming you make all payments in full and on time and do not change your Autopay payment election, are set forth in your Loan Closing Certificate based upon your prior Autopay election. If there is a change to your Autopay status the new interest rate and accrual will be reflected in your monthly payment for the next applicable billing cycle.

e.   Target Balance / Target Balance Date / Initial Monthly Payment / New Monthly Payment:  After the Target Balance Date, your loan will re-amortize to reflect your outstanding principal balance on the Target Balance Date and your new Monthly Payments will be adjusted to an amount required to cause the full repayment of the Loan by the Maturity Date.  You understand that your Initial Monthly Payments will not be fully amortizing, but your new Adjusted Monthly Payments after the Target Balance Date will be fully amortizing and will be calculated as follows:

(i)   If you do not make any voluntary prepayments before the Target Balance Date, then your new Monthly Payment will be the Adjusted Monthly Payment.

(ii)   If you make voluntary prepayments but such prepayments do not reduce your Total Loan Amount equal to or below the Target Balance by the Target Balance Date, then your new Monthly Payment will be an amount greater than your Initial Monthly Payment but less than the Adjusted Monthly Payment.

(iii)   If you make voluntary prepayments and such prepayments reduce your Total Loan Amount equal to the Target Balance by the Target Balance Date, then your new Adjusted Monthly Payment will be approximately equal to your Initial Monthly Payment.

(iv)   If you make voluntary prepayments to reduce your unpaid Total Loan Amount to less than the Target Balance by the Target Balance Date, then your new Adjusted Monthly Payment will be less than the Initial Monthly Payment reflected in the Loan Summary above for the remainder of the Term.

f.   Maturity Date.  Unless your loan is due earlier and payable as provided in this Agreement, your loan will mature on the Maturity Date.  On the Maturity Date, you agree to pay in full any unpaid amounts payable under this Agreement.

g.   Payment Method.  You may pay by Autopay or check. If you chose to pay by Autopay in your application, you agree to complete and submit the Automatic Payment Authorization Form (the "Autopay Authorization"). If you chose to pay by check, include your Loan Agreement Number on your check and mail it to GOODLEAP, PO BOX 4387, Portland, OR 97208.  You may change your payment method by following the instructions in the Autopay Authorization.

h.   Prepayment. You may prepay your loan at any time without penalty.

**4.   FEES.**  We will also charge you the following fees to the extent permitted by applicable law.

a.   Insufficient Funds Fee. Unless prohibited by law, you will be charged a non-refundable fee of $15 for each failed electronic or check payment attempt. Your bank may assess its own fee in addition to the fee we assess.

b.   Fee for the Removal and Refiling of Our County Fixture Filing.  See Section 6 below for further information.

c.   Transfer Fee. See Section 6 below for further information.

d.   Alternative Payment Convenience Fee.  Where permitted by law, if you request that we accept a payment via an alternative source such as a debit card, you may be charged a convenience fee, in an amount that we will disclose prior to your election to pay by such alternative method.

**5.   ADDITIONAL OBLIGATIONS AND REPRESENTATIONS.**

a.   Collateral. To the extent permissible by law, you irrevocably grant us a limited power of attorney with full power of substitution and re-substitution, to sign any documents and perform any acts, in your name and on your behalf, for the exclusive purpose of exercising our rights with respect to the Collateral under this Agreement. You also agree not to pledge, mortgage, encumber or otherwise permit the Collateral at any time to be subject to any lien or encumbrance that is superior to our security interest. See Section 6 below for further information on what constitutes eligible Collateral under this Agreement.

DocuSign Envelope ID: 8A742FB4-08B9-41EC-A98B-12FDB1284C4E

THIS IS A COPY

Unauthorized Copy of this record is a violation of VIA3.docusign.net

b.   Ownership Confirmation.  You represent and covenant that: (1) the Residence is your primary residential home dwelling or a second/vacation home and is not a rental property, or any business or commercial establishment or used as such; (2) you, or a trust controlled by you, are the fee simple owner of the Residence and the Collateral; (3) you are not, and will not, be in breach of your Home Improvement Agreement.

c.   Collateral Access. You agree to provide us or our designees after receiving reasonable notice, with access to the Residence for the purposes of (1) inspecting the Purchased Goods until this Agreement terminates or, (2) in the case of a foreclosure on the Collateral, removing the Collateral from the Residence.

d.   Personal Property. You and we both expressly intend that no portion of the Collateralized Goods will constitute a "fixture" attached to any real property, and that the Collateralized Goods will be removable personal property. You also agree not to take any action that might cause the Collateralized Goods to be treated as real property or as fixtures to real property. You agree that we may make a fixture filing, if we choose, provided that you and we agree that we may enforce rights in the Collateralized Goods under the Uniform Commercial Code and not under state real estate or mortgage law.

e.   Installation and Maintenance. You will take all steps necessary to enable the installation and proper functioning of the Purchased Goods to be completed in accordance with the Home Improvement Agreement and to be maintained in accordance with any Operations and Maintenance Agreement. You agree to keep the Purchased Goods in good working order and in compliance with manufacturing specifications, the operating and maintenance manuals, warranty requirements provided by your Installation Contractor and, if applicable, your Operations and Maintenance Contractor, and all applicable law, and not to remove or modify the Purchased Goods without our prior written consent.  You agree to maintain at all times an internet connection sufficient to ensure that monitoring data for the Solar Equipment can be fully transmitted, and consent to GoodLeap receiving such monitoring data, directly or through Contractor.  You will be responsible for the structural integrity of the location where the Purchased Goods are installed, including structural or electrical modifications necessary to prepare your Residence for the Purchased Goods.

f.   Property Conditions.  You agree that GoodLeap is not responsible for any known or unknown Residence conditions.  GoodLeap is not responsible and bears no liability for the malfunctioning of existing electrical equipment at the Residence, including but not limited to the main electrical service panel, any major electrical devices, or any other fuses or similar devices.

g.   Taxes. You agree to pay, when due, your taxes, assessments, or other similar fees. If you do not pay these taxes or other fees when due, we may pay them on your behalf and add the amount we pay to the principal of our loan under this Agreement. In the event that we choose pay these taxes and/or other fees on your behalf, you agree to assist us in these efforts.  Tax obligations that you may be required to pay may include: (1) the assessed value and the property tax assessments associated with the Purchased Goods calculated in the year this Agreement is signed; (2) transaction privilege taxes; and (3) any obligation to transfer tax credits or tax incentives of the Purchased Goods to any other person.

h.   Required Insurance. To the extent permissible by law, you agree to maintain and pay any deductibles under a homeowners' insurance policy or equivalent insurance policy reasonably acceptable to us covering the Purchased Goods in an amount equal to the full replacement and installation cost of the Purchased Goods or the outstanding balance of the loan. If there is a payout under the property coverage for damage to the Purchased Goods, you agree to deliver those insurance proceeds to us, and we will apply those proceeds to the loan in the order of priority set forth in Section 3b. of this Agreement.

i.   Credit Inquiries. You authorize us to obtain a credit report on you for any legal purpose in connection with this loan, including any update, extension of credit, review, or collection of this loan. Upon request, we will tell you the name and address of the credit bureau furnishing any report.

j.   Bankruptcy. You represent that you are not contemplating bankruptcy and that you have not consulted with an attorney regarding bankruptcy in the past six months. Any communication with us required or permitted under the Federal Bankruptcy Code must be in writing, must include your loan number, and must be sent to us at the address for GoodLeap.

**6.    GRANT OF SECURITY INTEREST IN COLLATERAL.**  As consideration for the loan we are providing and to secure your obligations under this Agreement, you hereby grant to us a security interest in the following property (collectively "Collateral"):

a.   all Purchased Goods excluding the roof and related roofing materials, if any (such Purchased Goods which excludes the roof and related roofing materials are referred to in this Agreement as "Collateralized Goods");

b.   all accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to the Collateralized Goods;

c.   all proceeds from warranty claims related to the Collateralized Goods, the Home Improvement Agreement and any Operations and Maintenance Agreement;

d.   all your rights, title, interests, and remedies under all agreements and other documentation relating to the Collateralized Goods (including, without limitation, the Home Improvement Agreement, and Operations and Maintenance Agreement);

e.   all consideration received from the collection, sale or other disposition of the Collateralized Goods, including any payment received from any insurer arising from any loss, damage or destruction of any Collateralized Goods and any other payment received as a result of possessing a Collateralized Goods, or any other proceeds of Collateralized Goods.

You authorize us to file on your behalf any documentation, including but not limited to a copy of this Agreement, a UCC financing statement and a county fixture filing to perfect our security interest in the Collateralized Goods (in case a third party seeks to classify the panels as a fixture). If you are refinancing your home, upon request, we may agree to lift our county fixture filing, on the Solar Equipment for a limited period of time, provided we will be able to refile upon closing of the mortgage refinancing.  A $200 fee will be assessed for the removal and refiling of our county fixture filing.   If you sell your home, your loan must be paid in full to remove the UCC financing statement and county fixture filing. The actual costs incurred, if any, of removing a UCC financing statement or country fixture filing will be added to your payoff amount if you elect to pay your loan in full before the end of the loan term. Alternatively, this loan agreement may be transferred to the new home owner if the new home owner qualifies for the loan product as outlined in Section 12.  A $300 transfer fee will be assessed for any transferred loan agreements.

**7.    INDEMNIFICATION.**  You agree to indemnify, defend and hold harmless us and our affiliates against any loss, liability, or damage that arises out of or relates to the transactions contemplated by this Agreement.

**8.   DEFAULT.** You will be in default under this Agreement if any of the following occurs:

a.   you fail to make any payment under this Agreement within fifteen (15) days of the date such payment is due;

b.   you fail to perform any of your obligations under this Agreement and you fail to cure such failure to perform to our reasonable satisfaction within thirty (30) days after receiving notice from us of your failure to perform;

c.   you terminate the Home Improvement Agreement without our consent after any loan proceeds have been disbursed;

d.   you remove, modify, sell or otherwise transfer the Collateral without our approval;

e.   any representation made by you on your loan application or this Agreement is false in any material respect when made;

f.   any of the following occurs (each a "Bankruptcy Event"): (1) you make an application for the appointment of a receiver, trustee or custodian or a receiver, trustee or custodian is appointed for you or a majority of your assets; (2) you initiate or consent to any legal proceedings under the Bankruptcy Code, or equivalent law providing for the relief of debtors; (3) you make an assignment for the benefit of creditors; or (4) you have a petition in bankruptcy or similar relief of debtors filed against you, which is not withdrawn or discharged within thirty (30) days of being filed.

of an authorized copy of this record is held at NA3.docusign.net

9. **REMEDIES.** Our remedies if you default on this Agreement include the following (to the fullest extent permitted by law):

a. **General.** In the event that you are in default under this Agreement, we may:

(1) Accelerate your Loan: We would declare our loan immediately due and payable. This requires you to pay in full the unpaid principal amount of the loan, all accrued interest, and any other amounts due under this agreement. Your loan will become immediately due and payable to us under a Bankruptcy Event, regardless of whether or not we take any action.

(2) Provide a report to the credit bureaus detailing any late payments, missed payments or other defaults: As required by law, you are hereby notified that a negative report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of this Agreement.

(3) Disable / Foreclose on the Collateral: (and exercise any other rights with respect to the Collateral that we have under this Agreement or applicable law). This includes disabling the Equipment remotely or by entering upon your property; and/or entering upon your property and removing and taking possession of the Collateral and then selling, leasing, or otherwise disposing of the property.

(4) Pursue all remedies available under applicable law: Including those of a secured creditor as permitted by applicable law.

(5) Stop making credit extensions under your loan: Including ceasing any funding that may be pending on your loan as permitted by applicable law

b. **Cost Reimbursement; Application of Proceeds.** Unless otherwise prohibited by state law, you are to promptly reimburse us, with interest, for all costs and expenses incurred in exercising our remedies related to this Agreement. If we choose to foreclose on the Collateral, we will apply any cash proceeds in the order of priority set forth in Section 3b. of this Agreement and then to you or as a court may otherwise direct.

c. **Deficiency Judgment.** To the fullest extent permitted by law we may require that you pay any amounts payable by you under this Agreement less any proceeds that we realize from our exercise of our remedies under this Agreement.

TO THE FULLEST EXTENT PERMITTED BY LAW, YOU ARE PERSONALLY LIABLE FOR ALL AMOUNTS PAYABLE UNDER THIS AGREEMENT. WE ARE NOT REQUIRED TO FORECLOSE ON THE COLLATERAL BEFORE INITIATING PROCEEDINGS AGAINST YOU AND YOUR ASSETS.

Our rights under this Agreement are cumulative and we may exercise these rights at any time if you default. In the event that we exercise any of our rights or remedies under this Agreement, you will continue to be in default until such time that you pay to us all amounts due and payable to us and you have cured any and all defaults. OUR FAILURE TO TAKE ANY ACTION OR DELAY TAKING ANY ACTION RELATED TO YOUR DEFAULT, OR SIMILAR OR UNRELATED DEFAULT, DOES NOT WAIVE, OR IMPLY A WAIVER OF ANY OF OUR RIGHTS UNDER THIS AGREEMENT.

10. **TERMINATION.** We may terminate this Agreement during any period in which a Force Majeure Event prevents, limits or otherwise impairs our ability to perform our obligations under this Agreement. A Force Majeure Event means any circumstance beyond the Parties' reasonable control, including but not limited to any act of nature, war, terrorism, rebellion, labor dispute, work stoppage, civil disorders, act of government, or any other similar major cause. This Agreement will terminate automatically if the final loan disbursement does not occur within one hundred eighty (180) days of the date you most recently received credit approval by us to enter into this Agreement. No delay in our exercise of the foregoing termination rights shall constitute a waiver of our continuing rights to terminate the Agreement. In addition, you may terminate this Agreement at any time prior to our disbursement of the loan proceeds, by sending advance written notice to us. The terms of this Agreement that would, by their express nature, survive the termination of this Agreement will survive and be enforceable under this Agreement. Upon termination of this Agreement, our security interest in the Collateral will terminate.

11. **NOTICES AND OTHER INFORMATION.** You agree to notify us if your name, email, or mailing address changes.

12. **ASSIGNMENT/REGISTERED FORM.** You may not assign or transfer your rights or obligations under this Agreement without our prior written consent, provided, that if you sell your home, you may transfer the loan obligations to the new home owner if (a) they meet our credit and underwriting criteria in place at that time by notifying us in writing at least thirty (30) days in advance using the contact information noted at the top of this Agreement, and (b) the warranties and operations and maintenance service obligations (if any) pertaining to the Purchased Goods are transferred to the new home owner. We reserve the right to not allow assignment of the loan in cases where you are in default under this Agreement. You agree that we may assign or transfer all or a portion of this Agreement and the related documents to any third party or affiliate. GoodLeap or its agent, acting as a non-fiduciary agent of the Borrower, shall maintain, a register within the meaning of U.S. Treasury Regulations Sections 5(f).103-1(c) on which it will record the names and addresses of each owner and their rights to principle and stated interest. Any transfer of all or a portion of a beneficial interest hereunder shall be recorded on such register. All parties to this agreement or their agents may treat each person or entity whose name is recorded in such register pursuant to the terms hereof as the applicable participant for all purposes under this Agreement. The register shall be available for inspection from time to time by any party hereto upon reasonable prior notice to GoodLeap or any of its agents. YOU AUTHORIZE US TO PROVIDE TO A THIRD PARTY OR AFFILIATE ANY INFORMATION THAT THEY MAY REQUEST IN CONSIDERING OR IMPLEMENTING A PURCHASE OF OUR RIGHTS UNDER THIS AGREEMENT. Arizona borrowers only: we will notify you if the entity responsible for allowing the assignment of your loan changes.

13. **LIMITATION OF LIABILITY.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, OUR LIABILITY TO YOU UNDER THIS AGREEMENT, IF ANY, SHALL BE LIMITED TO DIRECT, ACTUAL DAMAGES ONLY. YOU AGREE THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL OR INDIRECT DAMAGES.

14. **GOVERNING LAW AND MISCELLANEOUS.**

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

Except for the Arbitration agreement below, this Agreement shall be governed by federal law and, to the extent state law applies, the substantive laws of the state where the Residence is located. If any provision of this Agreement cannot be enforced, the rest of this Agreement will stay in effect. No amendment of this Agreement will be valid unless in writing and signed by both Lender and you (the Loan Closing Certificate shall not be deemed an amendment of this Agreement and is fully incorporated into this Agreement). This Agreement represents the entire agreement between the Parties regarding your loan. Our rights under this Agreement shall inure to the benefit of our successors and assigns, and your obligations under this Agreement shall be binding upon your heirs, personal representatives and permitted assigns.

15. **ARBITRATION AGREEMENT. All claims and disputes arising out of or relating to this Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis. The arbitrator shall also decide any issues relating to the making, validity, enforcement, or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, "arbitrability" issues). YOU HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JURY. FURTHER, UNLESS YOU OPT OUT OF ARBITRATION, YOU ALSO AGREE TO WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS OR REPRESENTATIVE ACTION IN COURT OR IN ARBITRATION. The arbitrator shall have the authority to award any relief, including injunctive relief, which is available under applicable law. Each party shall bear the expense of its own counsel, experts, witnesses and preparation and presentation of proofs. However, the arbitrator may award you reasonable attorney's fees and costs if this is expressly authorized by applicable law. Upon request, we will pay a portion of the fees and expenses of the arbitrator and the administrative fees and expenses of**

DocuSign Envelope ID: 8A742FB1-88B9-41BC-A988-12FDB1284C4E

THIS IS A COPY
Unauthorized Copy of this record is Prohibited.

the arbitration. The arbitrator shall issue a written award describing the essential findings supporting the award. All hearings in the arbitration shall take place within the federal judicial district where the Residence is located; the arbitrator's award shall be final and judgment on the arbitrator's award may be entered by the federal District Court. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules (the "Rules"). A copy of the JAMS Streamlined Arbitration Rules can be obtained from JAMS at https://www.jamsadr.com/rules-streamlined-arbitration or (800) 352-5267. The arbitrator shall be selected from the JAMS panel of neutrals and shall be a retired federal judge, a retired state appellate judge, or a retired state trial judge (in that order of preference). You agree that this agreement to arbitrate may be enforced by us or our affiliates, subsidiaries, or parents, and (g) each of their officers, employees, and agents. This arbitration agreement is made pursuant to a transaction involving interstate commerce. The Federal Arbitration Act (9 U.S.C. §§1-16) (the "FAA") shall govern this agreement to arbitrate including all arbitrability issues. No state law respecting arbitrability issues shall govern this agreement to arbitrate. Subject to and without limiting the foregoing, federal law shall apply to all other issues that arise under federal law and applicable state law as set forth in Section 14 above shall apply to all other issues that arise under state law (without reference to a state's choice of law rules). YOU MAY OPT OUT OF ARBITRATION BY SENDING US WRITTEN NOTICE WITHIN 15 DAYS OF SIGNING THE AGREEMENT STATING THAT YOU WISH TO "OPT OUT OF THE AGREEMENT TO ARBITRATE DISPUTES." THE OPT-OUT NOTICE SHOULD BE SENT TO THE FOLLOWING ADDRESS: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661. If you do not opt out, but any part or parts of your agreement to arbitrate are unenforceable then GoodLeap and you agree that such specific part or parts shall be of no force or effect and shall be severed, but the remainder of this agreement to arbitrate shall continue in full force and effect. If, however, the entire agreement to arbitrate or your waiver of the right to participate in class, representative or to arbitrate injunctive relief claims is unenforceable then the agreement to arbitrate shall be of no force or effect.

JUDICIAL REFERENCE FOR CALIFORNIA BORROWERS. IF THE RESIDENCE IS IN CALIFORNIA AND YOU OPT-OUT OF ARBITRATION, GOODLEAP AND YOU AGREE THAT ANY DISPUTES WILL BE RESOLVED IN THE SUPERIOR COURT FOR THE COUNTY IN A GENERAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), § 638(a). YOU ACKNOWLEDGE AND AGREE THAT IN A REFERENCE ACTION, ANY DISPUTE WILL BE HEARD BY A REFEREE AND NOT BY A SUPERIOR COURT JUDGE AND JURY AND HEREBY WAIVES HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO HAVE A TRIAL IN FRONT OF A JUDGE AND JURY. The Referee shall be appointed pursuant to CCP § 640 in the absence of agreement on the selection. The Referee shall have the same qualifications as the arbitrator. Upon request, GoodLeap will pay your portion of the fees and expenses of the Referee.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IF THE RESIDENCE IS IN CALIFORNIA AND YOU DO NOT OPT-OUT OF ARBITRATION, YOU MAY SEEK PUBLIC INJUNCTIVE RELIEF IN ARBITRATION TO THE EXTENT PERMITTED BY APPLICABLE LAW. IF, HOWEVER, ARBITRATION IS UNENFORCEABLE, IN WHOLE OR IN PART, THEN GOODLEAP AND YOU AGREE THAT SUCH DISPUTES WILL BE RESOLVED IN THE SUPERIOR COURT FOR THE COUNTY IN A GENERAL REFERENCE PURSUANT TO THE CALIFORNIA CODE OF CIVIL PROCEDURE ("CCP"), § 638(a). YOU ACKNOWLEDGE AND AGREE THAT IN A REFERENCE ACTION, ANY DISPUTE WILL BE HEARD BY A REFEREE AND NOT BY A SUPERIOR COURT JUDGE AND JURY AND HEREBY WAIVES HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO HAVE A TRIAL IN FRONT OF A JUDGE AND JURY. The Referee shall be appointed pursuant to CCP § 640 in the absence of agreement on the selection. The Referee shall have the same qualifications as the arbitrator. Upon request, GoodLeap will pay your portion of the fees and expenses of either the arbitrator or the Referee, as the case may be, any your portion of any administrative fee that the arbitrator, referee or JAMS may require.

Nothing in Section 15 shall prejudice the right of either party to: (a) seek and obtain such provisional relief or remedies as shall otherwise be available judicially pending appointment of the arbitrator or referee (b) bring their Dispute in small claims court on an individual basis, (c) exercise such self-help remedies as are authorized by law or contract, or (d) pursue judicial foreclosure as set forth in Section 9.

BY PLACING YOUR INITIALS BELOW THIS NOTICE YOU CERTIFY THAT YOU HAVE READ AND AGREE TO SECTION 15 IN ITS ENTIRETY.

Borrower's Initials: _____ JDM _____    Co-Borrower's Initials: _____ MIMB _____

**16.   ECOA NOTICE.** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, or age (providing that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal Agency that administers compliance with this law concerning this creditor is: The Federal Trade Commission, Consumer Response Center, Washington, DC 20580. Phone: 1-877-382-4357.

**17. BUYER'S RIGHT TO CANCEL. YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**18. STATE-SPECIFIC DISCLOSURES.**

**IN-HOME SALE CUSTOMERS: ARIZONA, CONNECTICUT, NORTH DAKOTA AND RHODE ISLAND RESIDENTS:**

THIS INSTRUMENT IS BASED UPON A HOME/PERSONAL SOLICITATION SALE SUBJECT TO THE PROVISIONS OF TITLE 44, CHAPTER 15 OF THE ARIZONA REVISED STATUTES IN ARIZONA, THE HOME SOLICITATION SALES ACT IN CONNECTICUT, AND THE NORTH DAKOTA CENTURY CODE IN NORTH DAKOTA. THIS INSTRUMENT IS NOT NEGOTIABLE.

**ALABAMA BORROWERS:** ALABAMA RESIDENTS: CAUTION – IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE AND LOAN AGREEMENT BEFORE YOU SIGN OR ACKNOWLEDGE IT.

**ARIZONA BORROWERS:** This instrument is based upon a home solicitation sale, which is subject to the provisions of title 44, chapter 15.1. This instrument is not negotiable.

**NOTICE OF RIGHT TO FILE COMPLAINT:** The owner of the property subject to this contract has a right to file a written complaint with the Arizona Registrar of Contractors for an alleged violation of Ariz. Rev. Stat. § 32-1154(A) within two (2) years of completion of the specific project subject to this contract. The Arizona Registrar of Contractors may be reached through its website: https://roc.az.gov/; or by telephone: (602) 542-1525.

Notice: You may request that the initial disclosures prescribed in the truth in lending act (15 United States Code §§ 1601 through 1666j) be provided in Spanish before signing any loan documents.

Aviso: Usted puede solicitar que las divulgaciones iniciales prescritas en la Ley de veracidad en los préstamos (Código 15 de los Estados Unidos de América, artículos 1601-1666j) se provean en español antes de firmar cualquier documento del préstamo.

Note: There are additional disclosures for Arizona borrowers in a separate document.

DocuSign Envelope ID: 8A742FB1-08B9-21BC-A98B-12FDB1284C4E

THIS IS A COPY
of an Authoritative Copy of this record held at NA3.docusign.net

**CALIFORNIA BORROWERS:  This loan is made pursuant to the California Finance Lenders Law, Cal. Fin. Code § 22000 et seq. FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION, STATE OF CALIFORNIA.**

**CONNECTICUT BORROWERS:** THIS INSTRUMENT IS BASED UPON A HOME SOLICITATION SALE, WHICH SALE IS SUBJECT TO THE PROVISIONS OF THE HOME SOLICITATION SALES ACT. THIS INSTRUMENT IS NOT NEGOTIABLE

**DISTRICT OF COLUMBIA BORROWERS: Buyer's Right to Cancel –** If this agreement was solicited at or near your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and it must be mailed before midnight of the third business day after you signed this agreement. The notice must be mailed to GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

**FLORIDA BORROWERS:** This is a home solicitation sale, and if you do not want the goods or services, you may cancel this agreement by providing written notice to the seller in person, by telegram, or by mail. This notice must indicate that you do not want the goods or services and must be delivered or postmarked before midnight of the third business day after you sign this agreement. If you cancel this agreement, the seller may not keep all or part of any cash down payment.

**For Loan Agreements executed in Florida:**  Florida documentary stamp tax required by law in the amount of $0.35 per hundred has been paid or will be paid by GoodLeap directly to the Department of Revenue.  Certificate of Registration #78-8017862271-5.

**ILLINOIS BORROWERS:** Prepayment in full on any installment date under this agreement will reduce insurance charges for the loan.

**IOWA BORROWERS:** NOTICE TO CONSUMER:

[1] Do not sign this paper before you read it.
[2] You are entitled to a copy of this paper.
[3] You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law
IMPORTANT: READ BEFORE SIGNING. The terms of this agreement should be read carefully because only those terms in writing are enforceable. No other terms or oral promises not contained in this written contract may be legally enforced. You may change the terms of this agreement only by another written agreement.

**KANSAS BORROWERS:  NOTICE TO CONSUMER:**

(1) Do not sign this agreement before you read it.
(2) You are entitled to a copy of this agreement.
(3) You may prepay the unpaid balance at any time without penalty.

**LOUISIANA BORROWERS**:

CONSUMER'S RIGHT TO CANCEL: If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement. The notice must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661. If you cancel, the seller must return all of your cash down payment.

Notwithstanding any other provision in this agreement, you will not be obligated to pay us for our attorney's fees more than twenty-five percent of the unpaid debt after default and referral to an attorney for collect.

**MASSACHUSETTS BORROWERS:  You may cancel this agreement if it has been signed by a party thereto at a place other than an address of the seller, which may be his main office or branch thereof, provided you notify the seller in writing at his main office or branch by ordinary mail posted, by telegram sent or by delivery, not later than midnight of the third business day following the signing of this agreement.  See the attached notice of cancellation form for an explanation of this right.**

**MARYLAND BORROWERS:** This loan is made pursuant to the Credit Grantor Closed-end Credit Provisions of Title 12, Subtitle 10 of the Maryland Commercial Law Article (Md. Code Ann., Com. Law § 12-1001 et seq.).

Note: If you are a Maryland borrower who is 65 or older: **YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**MICHIGAN BORROWERS: Notice to buyer:**

**(1) Do not sign this contract before you read it.**
**(2) You are entitled to a completely filled-in copy of this contract.**
**(3) Under the law, you have the right to pay off in advance the full amount due and, under certain conditions, to obtain a partial refund of the finance charge.**
**(4) You may rescind or cancel this contract, not later than 5 p.m. on the business day following the date thereof by giving written notice of rescission to the contractor or his agent at his place of business given in the contract or by mailing the notice or cancellation to the contractor to his place of business given in the contract by depositing a properly addressed certified letter in a**

DocuSign Envelope ID: 8A742FB1-98B9-41BC-A98B-12FDB1284C4E
THIS IS A COPY
Not an Authoritative Copy of this record stored at NA3.docusign.net

United States post office or mail box, but if you rescind after 5 p.m. on the business day following, you are still entitled to offer defenses in mitigation of damages and to pursue any rights of action or defenses that arise out of the transaction.

The seller is prohibited from having an independent courier service or other third party pick up your payment at your residence before the end of the 3-business-day period in which you can cancel the transaction.

MISSOURI BORROWERS: NOTICE OF CANCELLATION

If this agreement was solicited at your residence and you do not want the goods or services, you may cancel, without further obligation, this agreement by mailing a notice to the seller at the address as shown below, within 3 business days following the above date. You shall return the goods to seller in substantially the same condition as when you obtained them. Seller will then cancel all contracts and negotiable instruments executed by you and return any property given by you to seller within 10 days from date of transaction. If seller does not pick up the purchased goods within 20 days from date of your cancellation, you may retain or dispose of the goods without any further obligation.

The notice must be mailed to: GOODLEAP; 8781 Sierra College Blvd, Roseville, CA 95661

Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable.  To protect me and you (Lender) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

NEBRASKA BORROWERS: A credit agreement must be in writing to be enforceable under Nebraska law. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking, or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

NEW HAMPSHIRE BORROWERS: You or your attorney may file a complaint with the New Hampshire Bank Commissioner.

NEW JERSEY BORROWERS:

RECEIPT:  GOODLEAP - 8781 Sierra College Blvd., Roseville, CA 95661, Residential Solar/Storage System    Loan Down Payment: $0

NOTICE TO RETAIL BUYER: YOU MAY RESCIND THIS SALE PROVIDED THAT YOU NOTIFY THE RETAIL SELLER OF YOUR INTENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, POSTMARKED NOT LATER THAN 5 P.M. OF THE THIRD BUSINESS DAY FOLLOWING THE SALE. FAILURE TO EXERCISE THIS OPTION, HOWEVER, WILL NOT INTERFERE WITH ANY OTHER REMEDIES AGAINST THE RETAIL SELLER YOU MAY POSSESS. IF YOU WISH, YOU MAY USE THIS PAGE AS NOTIFICATION BY WRITING 'I HEREBY RESCIND' AND ADDING YOUR NAME AND ADDRESS. A DUPLICATE OF THIS RECEIPT IS PROVIDED BY THE RETAIL SELLER FOR YOUR RECORDS.

The section headings of this Note are a table of contents and not contract terms.  Portions of this Note with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires.  In this Note, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

NORTH DAKOTA BORROWERS: This instrument is based upon a personal solicitation sale, which is subject to the provisions of the North Dakota Century Code. This instrument is not negotiable.

OHIO BORROWERS: This loan is made pursuant to the provisions of Ohio Rev. Code Ann. §§ 1321.62-1321.702.

OKLAHOMA BORROWERS: You should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties.

BUYER'S RIGHT TO CANCEL If this agreement was solicited at your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement.

The notice must be mailed to: GOODLEAP; 8781 Sierra College Blvd., Roseville, CA 95661.

If you cancel, the seller may keep all or part of your cash down payment not to exceed five percent (5%) of the cash price.

RHODE ISLAND BORROWERS: NOTICE OF CANCELLATION – You may cancel this transaction, without any penalty or obligation, within three (3) business days from the above date. If you cancel, your cancellation notice must state that you do not wish to be bound by the agreement and mailed by registered or certified mail not later than midnight three (3) days following the buyer's signing the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made. All cancellations must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

SOUTH CAROLINA AND IDAHO BORROWERS:  BUYER'S RIGHT TO CANCEL – If you decide you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you sign this agreement.

The notice must be mailed to: GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**SOUTH DAKOTA BORROWERS**: Any improprieties in making the loan or in loan practices may be referred to the South Dakota Division of Banking at: 1601 N. Harrison Avenue, Suite 1, Pierre, SD 57501, Phone: 605.773.3421.

**UTAH BORROWERS: BUYER'S RIGHT TO CANCEL** – If this agreement was solicited at your residence or place of employment and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight on the third business day after you sign this agreement. The notice must be mailed to:  GOODLEAP, 8781 Sierra College Blvd., Roseville, CA 95661.

The written agreement is a final expression of the agreement between the creditor and debtor and the written agreement may not be contradicted by evidence of any alleged oral agreement.

**VIRGINIA BORROWERS**:  **BUYER'S RIGHT TO CANCEL – If this agreement was solicited at a residence and you do not want the goods or services, you, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right.**

**WISCONSIN RESIDENTS:** For married Wisconsin residents, my signature on this Promissory Note confirms that this loan obligation is being incurred in the interest of my marriage or family.  No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59 or court decree under Section 766.70 adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

**RHODE ISLAND BORROWERS: NOTICE TO BUYER**

(1) **Do not sign this agreement if any of the spaces intended for the agreed terms of the extent of then available information are left blank.**

(2) **You are entitled to a copy of this agreement at the time you sign it.**

(3) **You may at any time pay off the full unpaid balance due under this agreement, and in so doing you may be entitled to receive a partial rebate of the finance and insurance charges.**

(4) **The seller has no right to enter unlawfully your premises or commit any breach of the peace to repossess goods purchased under this agreement.**

(5) **You may cancel this agreement if it has not been signed at the main office or a branch office of the seller, provided you notify the seller at his main office or branch office shown in the agreement by registered or certified mail, which shall be posted not later than midnight of the third calendar day after the day on which the buyer signs the agreement, excluding Sunday and any holiday on which regular mail deliveries are not made.  See the attached notice of cancellation form for an explanation of buyer's rights.**

By signing below I/we confirm that I/we have read and agree to the terms in the Loan Agreement:

Borrower's Signature: _Jose david Murillo_____     Date: _Sep 1, 2022_

Co-Borrower's Signature: _Marina isamar Murillo berrios_____     Date: _Sep 1, 2022_

GoodLeap, LLC: _Matt Dawson_

**Matt Dawson, Co-Founder**

THIS IS A COPY
The Authoritative Copy of this record is held at na3.docusign.net

**EXHIBIT A: EXAMPLE OF LOAN CLOSING CERTIFICATE**

## Loan Closing Certificate

Borrower**:**                                                                          **Residence Address:**

Co-Borrower:

Email:

Phone:

Loan Agreement Number:

| LOAN SUMMARY | | | | |
|---|---|---|---|---|
| LOAN START DATE | FIRST PAYMENT DATE | RECURRING PAYMENT DAY | MATURITY DATE | TOTAL LOAN AMOUNT |

| SUMMARY OF LOAN TERMS AND PAYMENTS | | | | | | |
|---|---|---|---|---|---|---|
| LOAN TERM | TOTAL LOAN AMOUNT | INITIAL MONTHLY PAYMENT | INTEREST RATE / APR | TARGET BALANCE | TARGET BALANCE DATE | ADJUSTED MONTHLY PAYMENT* |

*Adjusted monthly payment assumes that no prepayment was made and the Target Balance was not met by the Target Balance Date, and you do not change the Autopay payment election.

Your interest rate/APR and monthly payments may vary depending upon whether you cancel or add Autopay payments during the term of the loan.

### SOLAR/STORAGE SYSTEM DESCRIPTION

Installation Contractor:                                              *Home Improvement Agreement Number:

*Purchased Goods under this Loan Agreement will be detailed in your Home Improvement Agreement

### PAYMENT TERMS

Term:                                                                          Target Balance Date:

Interest Rate / APR:                                                    Target Balance Amount:

Initial Monthly Payment:                                           Adjusted Monthly Payment:

### LOAN SUMMARY

Loan Start Date:                                                          Maturity Date:

First Payment Date:                                                    Total Loan Amount:

Recurring Payment Day:

DocuSign Envelope ID: 8A742FB1-98B9-41BC-A98B-13FDB1284C4E

THIS IS A COPY

The Authoritative Copy of this record is held at NA3.docusign.net



Credit Score Disclosure

H-4. Model form for credit score disclosure exception for loans not secured by residential real property

**GoodLeap**

**Your Credit Score and the Price You Pay for Credit**

## Your Credit Score

| Your credit score | **791** | |
|---|---|---|
| | Source: **transunion** | Date: **Sep 01, 2022** |

## Understanding Your Credit Score

| What you should know about credit scores | Your credit score is a number that reflects the information in your credit report. Your credit report is a record of your credit history. It includes information about whether you pay your bills on time and how much you owe to creditors. Your credit score can change, depending on how your credit history changes. |
|---|---|
| How we use your credit score | Your credit score can affect whether you can get a loan and how much you will have to pay for that loan. |
| The range of scores | Scores can range from a low of **300** to a high of **850**. Generally, the higher your score, the more likely you are to be offered better credit terms. |
| How your score compares to the scores of other consumers | Your credit score ranks higher than **71** percent of U.S. consumers. |

DocuSign Envelope ID: 8A742FB1-98B9-41BC-A988-12FDB1284C4E
THIS IS A COPY
The Authoritative Copy of this record is held at f6A3.docusign.net



**Credit Score Disclosure**

## Checking Your Credit Report

| | |
|---|---|
| What if there are mistakes in your credit report? | You have a right to dispute any inaccurate information in your credit report. If you find mistakes on your credit report, contact the consumer reporting agency.<br><br>It is a good idea to check your credit report to make sure the information it contains is accurate. |
| How can you obtain a copy of your credit report? | Under federal law, you have the right to obtain a free copy of your credit report from each of the nationwide consumer reporting agencies once a year.<br><br>To order your free annual credit report –<br><br>*By telephone:*   Call toll-free:  1-877-322-8228<br><br>*On the web:*   Visit www.annualcreditreport.com<br><br>*By mail:*   Mail your completed Annual Credit Report Request Form (which you can obtain from the Federal Trade Commission's web site at http://www.ftc.gov/bcp/conline/include/requestformfinal.pdf) to:<br><br>Annual Credit Report Request Service<br>P.O. Box 105281<br>Atlanta, GA 30348-5281 |
| How can you get more information? | For more information about credit reports and your rights under federal law, visit the Consumer Financial Protection Bureau's website at www.consumerfinance.gov/learnmore. |

COPY VIEW

DocuSign Envelope ID: 8A742FB1-88B9-41BC-A98B-43FDB1284C4E

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

**FOR ALL BORROWERS:**                                                                                    Sep 1, 2022

## NOTICE OF RIGHT TO CANCEL

**YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.**

**IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENT MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE  CANCELLED.**

**IF YOU CANCEL YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.**

**IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.**

**TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO GOODLEAP, AT 8781 SIERRA COLLEGE BLVD., ROSEVILLE, CA 95746 NOT LATER THAN MIDNIGHT OF___9/6/2022___(Month/Day/Year).**

**I HEREBY CANCEL THIS TRANSACTION.**


_____                    _____
**Date**                                              **Borrower**

THIS IS A COPY
The authorized copy of this receipt is held at NA3.docusign.net

**FOR ALL BORROWERS:**                                                                                          Sep 1, 2022

**NOTICE OF RIGHT TO CANCEL**

**YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.**

**IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENT MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE  CANCELLED.**

**IF YOU CANCEL YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.**

**IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.**

**TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM TO GOODLEAP, AT 8781 SIERRA COLLEGE BLVD., ROSEVILLE, CA 95746 NOT LATER THAN MIDNIGHT OF    9/6/2022    (Month/Day/Year).**

**I HEREBY CANCEL THIS TRANSACTION.**


_____                    _____
**Date**                                               **Borrower**

DocuSign Envelope ID: 8A742FB1-98B9-41BC-A98B-13FDB1284C4E

THIS IS A COPY

The authorative copy of this record is held at VA3.docusign.net

COPY VIEW

## PRIVACY POLICY AND INFORMATION SHARING NOTICE

**Privacy Policy:**  We take our responsibility to protect the privacy and confidentiality of customer information seriously.  We maintain safeguards that comply with federal standards to secure and protect your information.  This policy applies to consumers who are current or former customers of GoodLeap, LLC ("GoodLeap").  We gather information from your application, when you make a payment, consumer credit reporting agencies, public sources, and other data sources.  We may only disclose this data as permitted by law.  We may provide your information without your consent to regulatory or law enforcement agencies as permitted by law.

**Information Sharing and Opt-Out:**  Financial companies choose how they share your personal information.  Federal law gives you the right to limit some, but not all sharing.  Federal law also requires us to tell you how we collect, share, and protect your personal information.  Please read this notice carefully to understand what we do.  For additional information visit: http://www.goodleap.com/privacy.html.

The types of personal information we collect and share include, but aren't limited to:

|   |   |   |
|---|---|---|
| - Account Balances and Payment History | - Social Security Number and Income | - Address |
| - Bank Account Information | - Credit History and Scores | - Phone Numbers |

All financial companies need to share customers' personal information to conduct their everyday business.  In the section below, we list the reasons companies can share their customers' information; the reason we share this information; and whether you can limit this sharing. If you have any questions please call (877) 290-9991.

| Reasons we share your information | Do we share this information? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes such as to process your transactions, maintain your account, respond to court orders and legal investigations, or report to the credit bureaus | YES | NO |
| For our own marketing purposes to offer products and services to you | YES | NO |
| For joint marketing with other financial companies – to offer other services to you | YES | NO |
| For our affiliates everyday business purposes – information about your transactions and experiences | NO | NA |
| For our affiliates everyday business purposes – information about your creditworthiness | NO | NA |
| For our affiliates to market to you | NO | NA |
| For non-affiliates to market to you | NO | NA |

| | |
|---|---|
| **How does GoodLeap protect my personal information?** | To protect your information from unauthorized access and use, we use security measures that comply with federal law.  These include computer safeguards and secured files and buildings. |
| **How does GoodLeap collect my personal information?** | When you apply for a loan or make a payment.  We also collect information from other data providers such as credit bureaus. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only:<br>  - Sharing for affiliates' business purposes – info about your creditworthiness<br>  - Affiliates from using your information to market to you<br>  - Sharing with non- affiliates to market to you |
| **Affiliates** | Companies related by common ownership |
| **Non-Affiliates** | Companies not related by ownership or control.  Non-affiliates we can share with include other financial services companies or non-financial services companies. |
| **Joint Marketing** | A formal agreement between non-affiliated companies to market to you. |

For CA and VT residents only:  Under California and Vermont law we will not share information we collect about you with companies outside of GoodLeap unless the law allows.

## EXPRESS WRITTEN CONSENT TO COMMUNICATE OR CALL VIA CELL PHONE OR OTHER MEANS

We take your privacy seriously.  By signing this document, you are providing express written consent for GoodLeap, LLC ("GoodLeap") or companies working on our behalf to call you (including through automated means: e.g. autodialing, text, and pre-recorded messaging) via telephone, mobile device or cell phone (including SMS and MMS) and/or via email, even if your telephone number is currently listed on any state, federal, or national Do-Not-Call (DNC) list.

Consent is not required to conduct business with GoodLeap and this consent can be withdrawn at any time by calling (877) 290-9991 or requesting by mail at GoodLeap: 8781 Sierra College Blvd, Roseville, CA 95661. If you withdraw your consent you will be put on GoodLeap's internal Do-Not-Call list.

For NV residents only:  We are providing this notice under state law.  You may be placed on our internal Do-Not-Call list by calling (877) 290-9991. Nevada asks us to provide their contact information.  Office Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St. Suite 3900, Las Vegas, NV 89101.  Phone: (702) 486-3132; Email: bcpinfo@ag.state.nv.us.

**Borrower's Signature:**  Jose david Murillo                                          **Date:** Sep 1, 2022

DocuSigned by:
4D3F02649627 4C0...

**Co-Borrower's Signature:**  Marina isamar Murillo berrios                          **Date:** Sep 1, 2022

4D3F026496274C0...

THIS IS A COPY
The Authoritative Copy of this record is held at na3.docusign.net

**OPTIONAL OPT OUT OF CREDIT BUREAUS FROM SHARING PERSONAL INFORMATION FOR PRESCREENED OFFERS**

I understand that I have the ability to opt out of credit bureaus providing my personal information to third parties, including other lenders for prescreened offers, when my credit is pulled.  Below, I select whether I would like GoodLeap to opt out from prescreened offers on my behalf.  Whether or not I choose opt out **WILL NOT HAVE ANY IMPACT ON MY CREDIT APPLICATION WITH GOODLEAP**.  This voluntary opt out will be effective for five (5) years from the date of this election.  At any time, I/we may opt-in to again receive prescreened offers of credit or insurance at the website: www.optoutprescreen.com.

[  ]  I/we AUTHORIZE GoodLeap to utilize my/our information to opt-out from credit bureaus from providing my personal information to third parties for prescreened firm offers of credit or insurance on my/our behalf through the website: www.optoutprescreen.com upon loan funding.

[X]  I/we DO NOT AUTHORIZE GoodLeap to utilize my/our information to opt-out from credit bureaus from providing my personal information to third parties for prescreened firm offers of credit or insurance on my/our behalf through the website: www.optoutprescreen.com upon loan funding.

Borrower's Signature: _Jose david Murillo_____     Date: _Sep 1, 2022_

Co-Borrower's Signature: _Marina isamar Murillo berrios_____     Date: _Sep 1, 2022_

DocuSign Envelope ID: 8A742FB1-98B9-41FC-A98B-13FDF1384C4E

THIS IS A COPY
https://authorized-copy-of-this-record-is-held-at-hos.docusign.net

## MEMBERSHIP APPLICATION AND AGREEMENTS

GoodLeap partners with various financial institutions and credit unions who may purchase loans originated by GoodLeap. When a credit union purchases your loan you may be enrolled as a member of that credit union and will receive the added benefits of that membership. Your membership may be cancelled any time after enrollment at your request.

By initialing below, I understand that I am applying for a PenFed Credit Union Membership, I have read and reviewed the following disclosures.

https://www.penfed.org/forms/penfed-membership-disclosures
https://www.penfed.org/privacy-policy
https://www.penfed.org/current-service-fees
https://www.penfed.org/accounts/regular-savings-account

Borrower's Initials: **JDM**

## PENFED MEMBERSHIP AGREEMENT

The words "I", "me", "my", "myself" mean each person signing the Membership Application/Signature Card including anyone who has access to the account(s).

1.      I understand this account shall be governed by the Code of Virginia, federal laws, National Credit Union Administration (NCUA) Rules and Regulations, and the bylaws and policies and procedures of the credit union and amendments thereto. This account shall be subject to other terms and conditions which are subject to change upon notice to me.

2.      I agree PenFed has the right pursuant to its statutory lien, and I give my express consent to enable PenFed to charge against a balance in my PenFed accounts, including accounts on which I am a joint owner, to include otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate PenFed indebtedness owed by me or a person who is listed as a joint owner on my accounts with PenFed, including a deceased joint owner. This provision does not include my IRA account or other accounts for which this provision is not permitted under Internal Revenue Code. PenFed may take such action without further notice to me or a joint owner. In regard to those funds having a statutory protection, I understand I may withdraw my express consent for PenFed to apply such funds to pay such indebtedness by notifying PenFed in writing. If my consent is withdrawn, PenFed may, in its sole discretion, terminate services I have with the credit union.

3.      I expressly authorize PenFed to procure upon its request from a person, partnership, credit reporting agency, association, firm, or corporation a credit report, and for such person to furnish PenFed with said credit report concerning financial services I may request or obtain from PenFed as well as subsequent re-evaluation of such financial services.

4.      If I have caused PenFed to incur a loss due to my activities, or if accounts at PenFed are maintained by me in a manner PenFed, in its sole discretion, deems contrary to sound financial practice, I agree PenFed may terminate all accounts or services which I may receive from PenFed with the exception of my Regular Share Account.

5.      I understand if all my shares in PenFed are withdrawn, my membership in PenFed may be terminated. Funds in my accounts will be subject to collection through normal banking channels and PenFed's hold policy.

6.      I agree my share accounts are not transferable except on the records of PenFed.

7.      I agree payment of money in the account on the written instructions of an authorized person excuses PenFed of further legal obligation regarding the proceeds of the transaction. I agree to indemnify and hold PenFed harmless from suits or liability, directly or indirectly, resulting from the handling of the account consistent with the written instructions of an authorized person. PenFed may refuse to honor my instruction if it is unclear or the signature appears not to be authentic.

8.      Financial services provided by PenFed may be used for any transaction permitted by law. I agree illegal use of financial services will be deemed an action of default and/or breach of contract and such service and/or other related services may be terminated in PenFed's discretion. I further agree, should illegal use occur, to waive rights to sue PenFed for such illegal use or activity directly or indirectly related to it. I agree to indemnify and hold PenFed harmless from suits or other legal action or liability, directly or indirectly, resulting from such illegal use.

**9.      JOINT SHARE ACCOUNT AGREEMENT:**
If my accounts, either now or in the future, are established as a joint account, PenFed is authorized to recognize all of the joint owner signatures for the payment of funds or for transactions for this account. The joint owners of this account agree with each other and with PenFed that all funds deposited into the account shall be owned jointly by all joint owners. The funds on deposit will be subject to the withdrawal or receipt of all joint owners. In the event of death of an owner and according to the type of joint share account selected, withdrawal or payment may also be made to the survivor(s) or the estate(s) of the deceased owners(s). Each joint owner will discharge PenFed from liability for the payment or withdrawal. A joint owner who is a PenFed member may pledge all or part of the shares in this account as collateral security for a loan or loans, and PenFed is authorized to charge against this account indebtedness owing to it by each of the joint owners.

**Please note: Joint ownership does not constitute membership.**

This account shall be governed by the Code of Virginia, federal laws, rules and regulations, and the bylaws of PenFed and amendments thereto.

PenFed is federally insured by the National Credit Union Administration (NCUA). The information in this form is current as of May 2019 and is subject to change. To determine if changes have occurred since printing, call 800-247-5626. Our address, in accordance with NY Law, is 7940 Jones Branch Drive, Tysons, VA 22102.

I/we have read the attached Membership and Joint Account Agreement and, if accepted, I/we agree to comply with these terms and any amendments thereto, and to subscribe to at least one share. I/we authorize PenFed to obtain a credit report to determine my/our eligibility for this account or other financial services, I/we may request. Under penalties of perjury, I/we certify: 1) the number shown on the form is my/our correct taxpayer identification number; and 2) I/we am/are not subject to backup withholding because (a) I/we am/are exempt from backup withholding, or (b) I/we have not been notified by the Internal Revenue Service (IRS) that I/we am/are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me/us I/we am/are no longer subject to backup withholding (cross out this section if you are subject to withholding); and 3) I/we are a U.S. person (including a U.S. resident alien). The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

**PenFed Credit Union may purchase loans originated by GoodLeap. By reading and signing this document, I/we agree to the terms of this agreement and to become a member of PenFed if my/our loan is purchased by PenFed. If you sign this form and PenFed does not purchase your loan you will not become a member of PenFed.**

Borrower's Signature: **Jose david Murillo**            Date: Sep 1, 2022

THIS IS A COPY
The authorized copy of this record is held at DA3.docusign.net

## MONTHLY PAYMENT AUTHORIZATION DOCUMENT

GoodLeap is providing this document to you to complete your loan payment method.

[ x ] **Payment by Autopay**: GoodLeap offers Autopay as a service to our clients. *By paying with Autopay, you authorize GoodLeap and its agents, service providers, and successors or assignees to initiate preauthorized electronic fund transfers ("Autopay") on or after the Recurring Payment Day specified in the Loan Closing Certificate from your account described below or from any updated bank account that you subsequently supply to us* (the "Account"). If the Autopay is not made on the Recurring Payment Day for whatever reason, GoodLeap will deduct the payment on the next day that GoodLeap processes such payments, or as soon thereafter as practicable. The Autopay amount will be equal to the Initial Monthly Payment and then the Adjusted Monthly Payment as shown in your Loan Agreement (or any modified amounts we may later agree to) and will continue until your loan is paid in full or you cancel this authorization. If the amount of your payment changes from this amount, we will provide notice at least ten (10) days before the scheduled date of the payment. You certify that you are the owner or joint owner of the Account. We are not responsible for bank charges you may incur due to dishonored Autopay. We may reinitiate any Autopay from the Account that is unsuccessful up to two times, until it is successful. You further authorize us to correct any erroneous transactions with credits or debits to your Account, if necessary.

**Information for Autopay:**

| Bank/Credit Union Name | |
|---|---|
| 1111 | |
| Routing / ABA Number | Bank Account Number |
| 111111111 | 1111 |



Please know that you may terminate this authorization at any time by either (1) paying the remaining balance due, (2) sending written notice to us at **8781 Sierra College Blvd, Roseville, CA 95661**, or (3) calling 1-800-345-9372. It may take three business days for the change to take effect.  Cancelling Autopay does not terminate or relieve you of making all your payments on time each month. In addition, cancelling Autopay removes the Autopay discount which will increase your interest rate/APR by 0.50% which will result in a higher monthly payment.

[   ] **Payment by Alternative Method**: If this box is checked, you elect NOT to make your scheduled monthly payments by Autopay.  Instead each month, you must mail a check to us or arrange for payments to be made in some other manner acceptable to GoodLeap.  **There may be additional payment processing fees when electing alternative payment methods, such as debit card payment charges, where allowed by law.** Also, by choosing this option you understand that the interest rate/APR and monthly payment will not include the 0.50% discount if you had selected to pay by Autopay.

PLEASE KEEP A COPY OF THIS DOCUMENT FOR YOUR RECORDS.

Borrower's Signature: _Jose david Murillo_____   Date: _Sep 1, 2022_

DocuSigned by:
4D3F026496274C0...

DocuSign Envelope ID: 8A742FB1-98B9-41FC-A98B-13FDB1384C4E

THIS IS A COPY
The Authoritative Copy of this record is held at NA3.docusign.net

